UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

SEAN THOMAS,

Plaintiff,

-against-

CASE NO. 09 CV 3162 (CM)(HBP)

THE CITY OF NEW YORK, SERGEANT STEPHEN KELLY, shield #2057, POLICE OFFICER BRIAN SHEA, shield #13360, POLICE OFFICER MICHAEL MORENO, shield #5339, POLICE OFFICER LENNOX CORLETTE, shield #2845, POLICE OFFICER OSCAR PEREZ, shield #7650, POLICE OFFICER MICHAEL MCAULLIFE shield #1676, POLICE OFFICER THOMAS DEKOKER, shield #15364, POLICE OFFICER ANGELA POLANCOBRITO shield #4956, SERGEANT SASHA ROSEN shield #5061, POLICE OFFICERS JANE/JOHN DOE,

Defendants,

---------------------------------------------------------------X

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

**PRELIMINARY STATEMENT**

Plaintiff SEAN THOMAS ("THOMAS") was arrested on December 20, 2008, at approximately 2:00 A.M., at 1748 Eastburn Avenue, Bronx without probable cause. In sum, police were called to the scene by a landlord's son as a result of an argument in another apartment in the same building. Police arrived and soon thereafter took plaintiff into custody with several neighbors and the landlord's family looking on. Photos of much of the incident were captured by a professional photographer, including plaintiff laying facedown in the snow with officers stepping on his hair. Plaintiff was placed in handcuffs and transported to a hospital. At the hospital, officers left without saying anything to any doctor about plaintiff. No charges were brought as a result of the incident. Plaintiff sustained a fractured hand as police hit his hand with an object to remove him from a fence. No police paperwork was created by the arresting officer regarding the incident, i.e. no arrest report or any police documentation indicating the reason for this arrest. Following suit, faced with a lawsuit stemming from an incident without documentation, defendants alleged that the arrest was based upon Mental Hygiene Law Section 9.41. As will be demonstrated below, that section is inapplicable to this matter as plaintiff has no psychiatric history and plaintiff was not examined by a psychiatrist at the hospital he was transported to. Plaintiff initiated this action to recover from damages stemming from false arrest and excessive force. Plaintiff respectfully submits this memorandum of law in support of his motion, pursuant to Fed. R. Civ. P. 56, for summary judgment on his false arrest pursuant to 42 U.S.C. § 1983. Plaintiff avers that there are no genuine issues of fact relating to plaintiff's false arrest claim which warrant consideration by a fact-finder and that he is entitled to judgment as to liability against Defendants the CITY OF NEW YORK ("City"), and SERGEANT STEPHEN

KELLY ("KELLY"), POLICE OFFICER BRIAN SHEA ("SHEA"), POLICE OFFICER MICHEAL MORENO ("MORENO"), POLICE OFFICER LENNOX CORLETTE ("CORLETTE"), POLICE OFFICER OSCAR PEREZ ("PEREZ"), POLICE OFFICER MICHAEL MCAULLIFE ("MCAULLIFE"), POLICE OFFICER THOMAS DEKOKER ("DEKOKER"), POLICE OFFICER ANGELA POLANCOBRITO ("POLANCOBRITO"), SERGEANT SASHA ROSEN ("ROSEN", POLICE OFFICERS JANE/JOHN DOE, (from hereinafter referred to collectively as the "Defendant Officers").

**STANDARD FOR SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. P. 56, summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). There is no genuine issue of material fact when the non-moving party fails to establish an essential element of its claim. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In making this determination, the facts must be interpreted in the light most favorable to the non-moving party. Id. at 255 (citation omitted). Once the moving party meets its burden, the nonmoving party must demonstrate "specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis in original). In order to do so, the nonmoving party must establish more than "that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586 (citation omitted).

**ARGUMENT**

I. PLAINTIFF WAS FALSELY ARRESTED

The issue before the court in this matter is whether, based on the undisputed facts, it was objectively reasonable for Sergeant Kelly to determine that plaintiff was a threat to himself or others so as to justify confinement pursuant to N.Y. Mental Health Law § 9.41. A false arrest claim under 42 U.S.C. § 1983 has substantially the same elements as New York law, which requires a plaintiff to show "(1) the defendant intended to confine plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." See, e.g., Weyant v. Okst,101 F.3d 845, 852-53 (2d Cir. 1996) (citations omitted). When an officer makes a warrantless arrest, a presumption that the arrest was unlawful immediately arises. Jenkins v. City of New York, 478 F.3d 76, 88 (2d Cir. 2007) (citing Broughton v. State, 37 N.Y.2d 451, 456 (N.Y. 1975)). See also, Peterson v. County of Nassau, 995 F. Supp. 305, 313 (E.D.N.Y. 1998) (citing Broughton, 37 N.Y.2d at 456). The objective test for ascertaining probable cause for a warrantless arrest when a crime has been or is being committed "depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." Zellner v. Summerlin, 494 F.3d 344, 369 (2d Cir. 2007) (quoting Devenpeck v. Alford, 543 U.S. 146, 152 (2004)). See also, Burdick v. Johnson, 2009 Dist. LEXIS 51029, at *16-17 (N.D.N.Y. June 17, 2009) ("'The Fourth Amendment requires an official seizing and detaining a person for a psychiatric evaluation to have probable cause to believe that the person is dangerous to himself or others.' Hoffman v. County of Delaware, 41 F. Supp. 2d 195, 209 (N.D.N.Y. 1999) (internal citation and quotation marks omitted); see also Glass v. Mayas, 984 F.2d 55, 58 (2d Cir. 1993)"); Bayne v. Provost,

2005 U.S. Dist. LEXIS 40889, at *24 (N.D.N.Y. Aug. 4, 2005) (quoting Monday v. Oullette, 118 F.3d 1099, 1102 (6th Cir. 1997)) ("the question here is whether the facts and circumstances known to the Troopers at the time they determined to take Plaintiff into custody were sufficient to warrant a person of reasonable caution in the belief that Plaintiff might be 'mentally ill and conducting himself in a manner likely to result in serious harm to' himself as those terms are defined by the Mental Hygiene Law.").

Here, it is undisputed that plaintiff was taken into police custody and involuntarily hospitalized on December 20, 2008. He was not charged with any crimes. There can be no reasonable dispute that the first three elements of false arrest have been met, namely that the Defendant Officers intended to confine THOMAS, who was aware of the confinement and did not consent to it. Therefore, the inquiry becomes whether this detention was privileged under N.Y. Mental Hygiene Law § 9.41. See, Bayne, 2005 U.S. Dist. LEXIS 40889, at *15-16. The Mental Hygiene Law provides:

> [Until July 1, 2012, § 9.41 reads as set out below:] Any peace officer, when acting pursuant to his or her special duties, or police officer who is a member of the state police or of an authorized police department or force or of a sheriff's department may take into custody any person who appears to be mentally ill and is conducting himself or herself in a manner which is likely to result in serious harm to [fig 1] the person or others [fig 2] . Such officer may direct the removal of such person or remove him or her to any hospital specified in subdivision (a) of section 9.39 or any comprehensive psychiatric emergency program specified in subdivision (a) of section 9.40, or, pending his or her examination or admission to any such hospital or program, temporarily detain any such person in another safe and comfortable place, in which event, such officer shall immediately notify the director of community services or, if there be none, the health officer of the city or county of such action.
>
> [Eff July 1, 2012, § 9.41 reads as set out below:] Any peace officer, when acting pursuant to his special duties, or police officer who is a member of the state police or of an authorized police department or force or of a sheriff's department may

> take into custody any person who appears to be mentally ill and is conducting himself in a manner which is likely to result in serious harm to himself or others. "Likelihood to result in serious harm" shall mean (1) substantial risk of physical harm to himself as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that he is dangerous to himself, or (2) a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm. Such officer may direct the removal of such person or remove him to any hospital specified in subdivision (a) of section 9.39 or, pending his examination or admission to any such hospital, temporarily detain any such person in another safe and comfortable place, in which event, such officer shall immediately notify the director of community services or, if there be none, the health officer of the city or county of such action.
>
> N.Y. Mental Hygiene Law § 9.41.

With respect to arrests made pursuant to N.Y. Mental Hygiene Law § 9.41, the issues of whether the officers had probable cause to arrest existed, thus entitling the officers to qualified immunity, revolve around the knowledge of the officers at the time of arrest. Kerman v. City of New York, 374 F.3d 93, 116 (2d Cir. 2004). In Kerman, in the context of a challenge to an involuntary hospitalization, the Second Circuit held:

> Although the issues of probable cause and qualified immunity are not congruent, in that the latter requires consideration of the reasonableness of the defendant official's perception of the law, see, e.g., Saucier v. Katz, 533 U.S. at 205-06; Stephenson v. Doe, 332 F.3d at 78-79, most of the factual components here, such as what actions were taken, what information the officers possessed as to [the arrestee's] mental condition, and whether the officers' perceptions of the circumstances were reasonable in light of the information that was available to them, were common to both issues.

Id. As will be demonstrated below, the undisputed facts in this action dictate a conclusion that plaintiff was not apparently mentally ill at the time of the incident or conducting himself in a manner likely to result in serious harm to himself or others. Defendants' determination to the contrary was unreasonable as a matter of law and, therefore, the arrest was not privileged and the

officers are not entitled to qualified immunity.

In Kerman v. City of New York, 374 F.3d 93 (2d Cir. 2004), the Second Circuit had an opportunity to review and evaluate an involuntary hospitalization of an individual that police had determined was a threat to himself or others, as required by N.Y. Mental Hygiene Law § 9.41. The police came to the plaintiff's apartment in Kerman in response to a 911 call that stated the plaintiff was off his medication, had a gun, and was behaving erratically. Id. at 97-98. The 911 operator informed officers that an emotionally disturbed person was armed and provided the officers with Kerman's address. Id. at 98. After a search of the apartment yielded no firearm and the police ignored the opportunity to speak with the plaintiff's psychiatrist, the plaintiff was arrested and taken to the hospital. The Second Circuit in Kerman twice rejected the district court's granting qualified immunity, as a matter of law, to the arresting officer because a reasonable juror could find that it was unreasonable of the officer not to confirm the seriousness of the arrestee's mental condition, especially when the officer had two occasions to do so. Id. at 100. The Second Circuit held that the plaintiff "had a right not to be detained or involuntarily hospitalized by an officer who (on Kerman's version of the facts) did not know, and who patently ignored opportunities to determine, the seriousness of Kerman's condition and whether he was dangerous to himself or others." Id. at 111. Kerman stands for the proposition that the duty to investigate is of great importance. See, Panetta v. Crowley, 460 F.3d 388 (2d Cir. 2006) (applying Kerman, the court found that the officers had probable cause to detain an emotionally disturbed person after verifying two complaints via a thorough investigation). See also, Bayne, 2005 U.S. Dist. LEXIS 40889, at *9 n. 6 (citations omitted) (any misunderstanding by the officer of her authority to arrest pursuant to Mental Hygiene Law § 9.41 was immaterial to the court

because the officer had thoroughly investigated the substance of a 911 call, which alleged that the arrestee was suicidal, prior to taking the arrestee into custody).

Although there is no brightline rule for determining whether someone is an "EDP", there are certain factors that were relevant in the Second Circuit's evaluation of the arrest. The factors the Kerman court viewed as relevant included: the state of the apartment (whether it was messy), the arrestee's demeanor (which was disputed between the parties), the degree of inquiry into the arrestee's psychological background, that arrestee was off his medication, that there was an allegation of a weapon, and whether the complaint against the arrestee was verified. In addition, another relevant factor is the degree of intoxication of the arrestee. See, Burdick v. Johnson, 2009 U.S. Dist. LEXIS 51029 (N.D.N.Y. June 17, 2009) (hospitalization was warranted where arrestee claimed to have a gun, was highly intoxicated, and called 911 in order to threaten to kill a police officer if the officer came back to the arrestee's home). Arrests pursuant to Mental Hygiene Law § 9.41 seem justified in extreme circumstances where the arrestee has a known psychological history and presents a deadly threat to himself or others. See, Vallen v. Connelly, 2004 U.S. Dist. LEXIS 4490 (S.D.N.Y. Mar. 19, 2004) (the court upheld the arrest and involuntary hospitalization where the arrestee, a known schizophrenic, refused to comply with the conditions of his release from prior psychiatric hospitalization and had made an anonymous phone call stating he would kill himself or anyone that came to take him back to the hospital).

Many of the material facts as represented by the officers in this case are disputed by the testimony of non parties who have no interest in the outcome of this case. For example, prior to placing plaintiff in custody, the officers testified that THOMAS was yelling. In contrast, non-party witnesses testified that plaintiff was not screaming but was, instead, talking with the

officers. (Ex. L, 24:11-15; Ex. M, 13:12-23; Ex. N, 26:11-16). All of the officers deny hitting or seeing another officer hit plaintiff's hand to get him to let go of the fence. However, multiple non-party and disinterested witnesses, including the 911 caller, saw one officer hitting THOMAS's right hand repeatedly with an object. (Ex. L, 31:16-24, 33:18-25, 34:16-18, 49:10-25; Ex. M, 27:3-13, 29:4-6; Ex. N, 31:14-32:2, 40:20-23; Ex. O, 31:1-18, 53:18-54:5). Similarly, every officer, in one form and at one time or another, claimed that THOMAS tried to kick them after he was placed in custody. However, the non-party witnesses testified that THOMAS never tried to kick or otherwise act violently towards the officers. (Ex. L, 44:1-3;Ex. M, 29:14-30:3; Ex. N, 42:15-17). Additionally, all of the officers deny kicking or hitting plaintiff when he was lying on the ground after being taken up the street. However, a non-party witness described seeing several individuals, who she did not know at the time were police officers, kicking and beating up what appeared to be a homeless person lying on the ground. Ex. P, 12:8-13:11). Plaintiff's testimony corresponds with that of the non-parties.

Looking to the undisputed facts in this case as this Court on a motion for summary judgment must, there was no reasonable basis upon which to conclude that plaintiff represented a serious threat to himself or others at any time before he was taken into custody. Defendants PEREZ and CORLETTE responded to a 911call reporting an argument at 1748 Eastburn Avenue. (Pl.'s 56.1, ¶3). PEREZ and CORLETTE spoke with THOMAS and his girlfriend, Letitia Marrow ("Marrow"), regarding the argument they were having evening. (Pl.'s 56.1, ¶4). Both THOMAS and Marrow spoke with the officers, after which THOMAS voluntarily accompanied the officers outside. (Pl.'s 56.1, ¶¶4, 5). Officer CORLETTE testified that he called for an additional unit. (Ex. A, 23:9-25). Officers KELLY, SHEA, MORENO,

MCAULLIFE and DEKOKER arrived on the scene pursuant to this call. (Pl.'s 56.1, ¶6).

SGT. KELLY was the ranking member of an Anti-Crime Unit consisting of Officers SHEA and MORENO. (Ex. C, 5:2-19; Ex. D, 6:24-7:16). Upon arrival, SGT. KELLY became the supervisor of the other officers and in charge of the scene. (Ex. B, 28:3-7; Ex. F, 17:13-20). According to the testimony of the officers on the scene, SGT. KELLY independently determined THOMAS to be an EDP and ordered the officers to take him into custody. Shortly after, he ordered that THOMAS be taken to the hospital. (Ex. A, 67:22-68:1; Ex. B, 43:3-7, 51:19-21; Ex. D, 21:22-23:4; Ex. E, 18:3-19:24; Ex. F, 38:13-19; Ex. G, 19:11-14, 30:7-11). SGT. KELLY testified that he decided to arrest THOMAS "because he was yelling and screaming in such a manner that it led me to believe that there was a psychiatric issue,"due to the early hour of the morning, and that "he would benefit from a psychiatric evaluation." (Pl.'s 56.1, ¶7, quoting Ex. C, 18:12-21, 72:13-73:4). SGT. KELLY admitted that he did no investigation into whether THOMAS had any psychiatric history. (Ex. C, 42:18-43:4). It is undisputed that THOMAS did not hit, strike, or do anything physical to anyone prior to being placed under arrest. (Pl.'s 56.1, ¶10). No witness had complained about plaintiff or claimed to have been threatened by him. In fact, no person had told police anything other than the existence of an argument. There was no allegation at any point that plaintiff was armed. No witness claimed to have been threatened by plaintiff. In addition, the officers all testified that they did not conduct any investigation into plaintiff's psychiatric or criminal history at any time, both before and after arrest. (Pl.'s 56.1, ¶9). The District Attorney's office was never notified of the incident.

An officer's investigation prior to arresting someone as an EDP must be reasonable. Kerman, 374 F.3d at 100. Here, as demonstrated by the undisputed facts, the officers did not

conduct any investigation whatsoever before they grabbed plaintiff, placed him under arrest, and, in the process, cause a fractured hand requiring treatment. Plaintiff does not have any psychiatric history, a fact which the officers neglected to even inquire about. Additionally, plaintiff was not suspected of being armed. (Ex. K, p. 11). Cf., Burdick, 2009 U.S. Dist. LEXIS 51029; Vallen, 2004 U.S. Dist. 4490. According to all of the officers' testimony, at no point prior to being arrested did THOMAS physically interact with the officers. (Pl.'s 56.1 ¶10). Although plaintiff disputes the officers' allegations that he attempted to kick them after he was placed in custody, any such facts are irrelevant to the inquiry at hand because they occurred after plaintiff was already taken into custody. Zellner, 494 F.3d at 369 (probable cause is based on the information known to the officers at the time of arrest); Kerman, 374 F.3d at 116 (probable cause and qualified immunity in the context of forced hospitalization pursuant to Mental Hygiene Law § 9.41 revolve around the reasonableness of the arresting officers' knowledge of the arrestee's mental state at the time of arrest); Burdick, 2009 Dist. LEXIS 51029, at *16-17 (assessing the reasonableness of officers' determination to take someone into custody for a psychiatric evaluation depends on the facts known to the officers at the time of the arrest).

An individual can only be taken into custody for the purposes of undergoing a psychiatric evaluation if there is a likelihood of serious harm to the individual or someone else. Mental Hygiene Law § 9.41. "Likelihood to result in serious harm" is defined as:

> (1) substantial risk of physical harm to himself as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that he is dangerous to himself, or (2) a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm.

Id. Defendant Officers' allegations that plaintiff was yelling, appeared agitated, and refused to

leave the places where he was residing can not form the basis for an arrest pursuant to Mental Hygiene Law § 9.41. No reasonable fact finder could find that plaintiff was suicidal, a danger to himself, manifesting a homicidal intent, or placing others in reasonable apprehension of serious physical harm. Overall, merely being loud or upset cannot be a basis for an arbitrary arrest. Nor can refusing to leave the place where you live. (Pl.'s 56.1, ¶2) Without the risk of serious harm or any investigation into the arrestee's psychological history, an arrest cannot be privileged under Mental Hygiene Law § 9.41. Kerman, 374 F.3d at 100.

## II. AT THE HOSPITAL, PLAINTIFF WAS NOT EXAMINED BY A MENTAL HEALTH PROVIDER OF ANY SORT AND, THEREFORE, DEFENDANTS' ARREST WAS NOT PRIVILEGED.

As indicated by the records from St. Barnabas Hospital on the date of the incident, no psychiatric evaluation was ever conducted of the plaintiff. (Ex. K). No determination was made by any mental health provider whether plaintiff was, in fact, a danger to himself or others as required by Mental Hygiene Law § 9.41. None of the pertinent officers made even minimal efforts–such as speaking with a doctor or member of the hospital staff–to ensure that he be afforded such an evaluation. (Pl.'s 56.1, ¶15). Mental Hygiene Law § 9.41 provides a privilege for arrests "for the purposes of a psychiatric evaluation" when an individual is a threat to himself or others. See, e.g., Vallen v. Connelly, 2004 U.S. Dist. LEXIS 4490, at *23 (S.D.N.Y. Mar. 19, 2004) (citing Glass v. Mayas, 984 F.2d 55, 58 (2d Cir. 1993)). Logic, statutory interpretation and policy considerations all lead to the conclusion that, because no psychiatric evaluation was conducted at the hospital or requested by the officers, the procedure for arresting an EDP was not followed and the privilege defendants presently rely upon is unavailable.

Involuntary confinement or forced psychiatric treatment can constitute a "massive

curtailment of liberty." Vitek v. Jones, 445 U.S. 480, 491 (1980). It has long been established that a "state cannot constitutionally confine without more a nondangerous individual who is capable of surviving in freedom by himself or with the help of willing and responsible family members." Glass, 984 F.2d at 57 (quoting O'Connor v. Donaldson, 422 U.S. 563, 576 (1975)). Although Glass v. Mayas was a case discussing involuntary commitment, this reasoning has been applied in the context of arrests for the purposes of psychiatric evaluation of potentially dangerous individuals. "[T]he Fourth Amendment requires an official to have probable cause to believe that a person is dangerous to himself or others before he can seize and detain such person for a psychiatric evaluation." Vallen, 2004 U.S. Dist. LEXIS 4490, at *23 (citing Glass, 984 at 58). See also, Burdick, 2009 U.S. Dist. LEXIS 51029, at *15-16 (citing, Glass, 984 F.2d at 58; quoting Hoffman, 41 F. Supp. 2d at 209) ("The Fourth Amendment requires an official seizing and detaining a person for a psychiatric evaluation to have probable cause to believe that the person is dangerous to himself or others.").

The policy behind involuntary hospitalization balances the substantial liberty interest of the arrestee with the need for a psychiatric evaluation based on potential risk. Vitek, 445 U.S. at 491; Glass, 984 F.2d at 57; Burdick, 2009 U.S. Dist. LEXIS, at *15-16; Vallen, 2004 U.S. Dist. LEXIS 4490, at *23. In other words, if there is a great enough potential need for psychiatric treatment, then an individual may be seized in order to have the legitimacy of the need evaluated. The plain language of Mental Hygiene Law § 9.41 demonstrates that the purpose of detaining an individual is to conduct a psychiatric evaluation out of concern for the welfare of the individual as well as, potentially, that of others. The statute is ripe with references to whether the individual is a risk to himself or others, and emphasizes that special care be taken to ensure that the

individual is detained in "safe and comfortable" conditions. Mental Hygiene Law § 9.41. However, the need to infringe upon an individual's liberty and the subsequent concern for the comfort of the individual's detention only arise when there is a need to take the individual into custody for a psychiatric evaluation. It stands to reason, then, that without a psychiatric evaluation, an individual's liberty will have been taken away without a purpose.

The Mental Hygiene Law § 9.41 requires that if a person will be held pending a psychiatric evaluation, they must be held under "safe and comfortable" conditions. Mental Hygiene Law § 9.41. Here it cannot be and in fact was not disputed that plaintiff was detained face down in the snow and ice for at least minutes while EMS officers were summoned to the scene. (Ex. A, 50:6-14; Ex. F, 35:20-36:2). In addition, Officer MCAULIFFE testified that he stood on THOMAS's foot or leg for at least ten minutes while waiting for the ambulance to arrive. (Ex. F, 35:4-36:2). No reasonable interpretation of the phrase "safe and comfortable" conditions could encompass standing on an individual after forcing him to lie face down in snow and ice. Therefore, there can be no pretense that the officers were at all concerned with THOMAS's welfare, which further belies their claim that THOMAS was an EDP.

In this case, THOMAS was allegedly arrested as an EDP, but no psychiatric evaluation was ever conducted. Ignoring the fact that mere yelling is insufficient to constitute a risk of serious harm, as argued above, the officers made no effort to have THOMAS evaluated by a psychiatrist. SGT. KELLY testified that, although he claimed to have told the EMTs they were called for an EDP, he did not tell the hospital that THOMAS was in need of a psychiatric examination. (Ex. C, 49:24-50:8). Officers CORLETTE, PEREZ, DEKOKER, and MCAULIFFE all went to the hospital with plaintiff. (Ex. B, 54:24-55:22). Officer CORLETTE,

who accompanied plaintiff in the ambulance to the hospital, testified that he did not speak to any doctors in the hospital. (Ex. A, 53:8-10, 57:19-21). Officer PEREZ testified that he followed the ambulance in his police vehicle and that he did not speak with any doctors. (Ex. B, 58:3-9). Officer DEKOKER testified that he rode in the ambulance, as well, and that he did not speak with any doctors or hospital staff. (Ex. G, 28:7-10, 39:2-22). Officer MCAULIFFE testified that he went to the hospital with PEREZ in a patrol car but that he could not remember whether he even went into the hospital. (Ex. F, 37:2-15). Officer MCAULIFFE created a memo book entry in which he stated in its entirety that he went to the scene, plaintiff was taken to the hospital, and an aided card was made. (Ex. F, 42:6-43:10). Besides the alleged Aided Card and MCAULIFFE's undetailed entry, absolutely no paperwork was created as a result of this incident. (Ex. A, 61:16-18; Ex. B, 57:17-19; Ex. C, 48:3-49:16, 67:20-67:22, 68:9-69:6; Ex. D, 12:3013:2, 43:4-23; Ex. E, 45:9-25). Despite demand, the defendants never were able to produce the Aided Card in this litigation. No effort was made by any of the officers to achieve the very purpose for which THOMAS was seized or to document their actions.

The only treatment that THOMAS received at the hospital was for the broken bone in his hand. The fact that no psychiatric evaluation was conducted belie any claim that THOMAS was arrested as an EDP. It appears that no legitimate interest was served in detaining THOMAS since no effort was made to secure the purpose of the detention, namely a psychiatric evaluation. The officers admit that no crime was committed at the scene. (Ex. A, 46:18-24, 67:4-7; Ex. B 52:12-53:13; Ex. D, 41:9-17; Ex. E, 18:3-19:24). As a result, the arrest seems to be completely arbitrary and the EDP determination has the nefarious appearance of a concocted justification for the use of force made after the fact. The fact that no efforts were made to secure the evaluation

and the complete lack of any police paperwork being created for this incident, cast further suspicion on the legitimacy and motives surrounding the arrest.

Overall, plaintiff was deprived of his substantial liberty interest without constituting a threat to himself or others and without any intention to be evaluated by a psychiatrist. Vitek, 445 U.S. at 491; Glass, 984 F.2d at 57; Burdick, 2009 U.S. Dist. LEXIS, at *15-16; Vallen, 2004 U.S. Dist. LEXIS 4490, at *23.

## CONCLUSION

With all factual inferences made on behalf of the Defendants, the non-moving party, the undisputed facts, primarily gathered from the testimony of the Defendant Officers, establishes no issue of triable fact as to the liabilty of the CITY OF NEW YORK and Defendant Officers with respect to the claim of false arrest. On the facts of this case, no reasonable juror could find probable cause to believe that THOMAS was an EDP. As a result of the foregoing, plaintiff is entitled to summary judgment on the issue of false arrest.

Dated: Brooklyn, New York
March 19, 2009

**LAW OFFICE OF DAVID A. ZELMAN**

By: David A. Zelman, Esq.
Attorney for Plaintiff: Sean Thomas
612 Eastern Parkway
Brooklyn, New York 11225
(718) 604-3072

TO: Via Email and mail:
Raju Sundaran, Esq.
New York City Law Dept.

100 Church Street
New York, New York 10007