UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------ x

SEAN THOMAS,

**OPINION & ORDER**

                                                    Plaintiff,

**09 CIV. 3162 (ALC)**

                    -against-

SERGEANT STEPHEN KELLY, shield #2057, POLICE
OFFICER   BRIAN   SHEA,   shield   #13360,   POLICE
OFFICER MICHAEL MORENO, shield #5339, POLICE
OFFICER LENNOX CORLETTE, shield #2845, POLICE
OFFICER   OSCAR   PEREZ,   shield   #7650,   POLICE
OFFICER   MICHAEL   MCAULIFFE,   shield   #1676,
POLICE OFFICER THOMAS DEKOKER, shield #15364,
POLICE   OFFICER   ANGELA   POLANCOBRITO   shield
#4956,   SERGEANT   SASHA   ROSEN   shield   #5061,
POLICE OFFICERS JANE/JOHN DOE,

                                                    Defendants.

------------------------------------------------------------------------ x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 10-23-12

**ANDREW L. CARTER, JR., District Judge:**

Defendants Sergeant Stephen Kelly and Officers Michael McAuliffe and Thomas

Dekoker (collectively, "defendants") move for (1) judgment as a matter of law, pursuant to rule

50, Fed. R. Civ. P., (2) for a new trial pursuant to Rule 59, Fed. R. Civ. P., or (3) in the

alternative, for remittitur of the damages awards. For the reasons given below, the defendants'

motion for judgment as a matter of law is denied. The defendants' motion for a new trial with

respect to defendants' liability is also denied. The defendants' motion for a new trial is denied

with respect to the compensatory damages on plaintiff's false arrest claim. The defendants'

motion for a new trial is granted with respect to the punitive damage award unless plaintiff

accepts a remittitur reducing the amount of punitive damages to $325,000.

1

## BACKGROUND

Plaintiff Sean Thomas ("Thomas") brought this action under 42 U.S.C. § 1983, alleging false arrest and excessive use of force against several police officers. He also brought analogous claims under New York State law.[1] A jury trial was commenced on June 25, 2012. On July 9, 2012, the jury returned a verdict for the plaintiff, finding Kelly liable for false arrest and awarding plaintiff $125,000 in compensatory damages, and finding Kelly, Dekoker, and McAuliffe liable for using excessive force and awarding plaintiff no compensatory damages and $1 in nominal damages. The jury awarded $500,000 in punitive damages against all three of these defendants. The jury found in favor of all other defendants.

It is not disputed that on the night of December 20, 2008, Thomas and his girlfriend, Leticia Marrow ("Marrow"), were arguing in 1748 Eastburn Avenue, Apt. 2—the apartment that Marrow shares with her daughter. Thomas lived in the apartment as well, although his name was not on the lease. That night, Thomas and Marrow were arguing loudly enough that their downstairs neighbor, Ravi Sookraj ("Sookraj"), overheard them. At approximately 2:00 am, Sookraj called 911 and told the 911 operator that there was a "domestic violence dispute" in Marrow's apartment. The parties at trial vigorously disputed what happened next, but by around 3:00 am, Thomas was handcuffed, wrapped in a restraint blanket, strapped to a stretcher, and transported in an ambulance to receive a psychological evaluation at St. Barnabas Hospital, where he was involuntarily sedated. Thomas woke up around 9:00 am in a bed in the emergency

---

[1] Plaintiff's state law claims were dismissed as to all but two defendants, Officers Rosen and Polancobrito, based on improper service. Plaintiff's Monell claim against the City of New York was dismissed as well. See Thomas v. City of New York, et al.,09-cv-3162 (CM) (HBP), 2010 WL 5490900 (S.D.N.Y. Dec. 22, 2010).

room naked and covered only by a sheet. Thomas was free to leave the hospital, and he was not

charged with any crime nor did he receive a summons or a desk appearance ticket.

At trial, the parties presented the jury with competing versions of the events that

transpired between the time the first officers arrived at Marrow's apartment and when Thomas

was taken to the hospital. The defendants' theory of the case was that the officers had probable

cause to arrest Thomas under N.Y. Mental Hygiene Law § 9.41 in order to transport him to a

hospital for psychiatric evaluation because Thomas's behavior was consistent with that of an

emotionally disturbed person who posed a danger to himself or others.[2] The factual premises of

this theory were that: (1) Thomas was behaving irrationally and incoherently; (2) Thomas was

violent and was threatening to act violently; and (3) Thomas made a suicidal statement to the

officers. Even though Thomas was not arrested for any criminal offense, defendants also argue

that they had probable cause to arrest Thomas for (1) trespass, (2) obstruction of governmental

administration, (3) disorderly conduct, and (4) menacing.

By contrast, Thomas's theory of the case was that the officers, in particular, Kelly, over-

reacted to a rather routine domestic violence dispute between him and Marrow, and in so doing,

falsely treated him as a person who was suffering from a mental illness. Thomas denied ever

making a suicidal statement, and he and other witnesses testified that Thomas was calm, rational,

---

[2] Although Thomas was not technically placed under arrest, the Court will refer to his detainment as an arrest. See generally Disability Advocates, Inc. v. McMahon, 279 F. Supp. 2d 158, 168-69 (N.D.N.Y. 2003) aff'd, 124 F. App'x 674 (2d Cir. 2005) (finding that a "custodial detainment pursuant to N.Y. Mental Hygiene Law § 9.41 is the functional equivalent of an arrest").

and non-violent.  As such, the jury was asked to resolve a stark factual dispute relying primarily on the credibility of those who testified.

For example, during Thomas's initial encounter with Sergeant Kelly, which was before Thomas was arrested and deemed by Kelly to be an emotionally disturbed person, Kelly and Dekoker described Thomas as "screaming" and "incoherent," (Kelly Tr. 54:2–3, Dekoker Tr. 26:23), whereas Thomas said he was "pretty calm" and "cool." (Thomas Tr. 15:11.) Sookraj, a neutral witness, overheard the conversation between Thomas and Kelly and testified that Thomas spoke to Kelly with a "normal" tone of voice without using any profanity. (Sookraj Tr. 10:24–11:3.) It was during this admittedly brief conversation where Thomas allegedly made the suicidal threat.  Kelly testified that Thomas "asked me to kill him" or "shoot" him.  (Kelly Tr. 25:15–17.) Similarly, Dekoker testified that heard Thomas say to Kelly, "[Y]ou are going to have to shoot me. Shoot me." (Dekoker Tr. 27:5–6.) Thomas admitted to making a similar-sounding statement, but denied ever making a suicidal threat:

> So, at this time I'm surrounded now.  I don't know how many but it is enough officers I'm surrounded by.  I'm looking and feeling intimidated and now, like, surrounded by officers and I was like all right, I believe I told him, I said <u>if you think you're going to beat me up or something you're going to have to kill me because you're not going to beat me up in the streets or nothing like that</u>.  No, you're not.

(Thomas Tr. 15:19–25.)  Crucially, Kelly made his "final determination" to take Thomas into custody only after this statement was made, which Kelly interpreted to be a suicidal threat.  (Kelly Tr. 25:15–17.)

Thomas testified that he was then "rushed" by the officers, whereupon Kelly kneed him in the face.  (Thomas Tr. 16:1–7, 17:2–3.)  According to Thomas, he turned away and grabbed onto a nearby fence, but the officers were "pulling me, tugging on me, yanking on me" and that

4

he was being "hit all over." (Thomas Tr. 17:5–15.) Thomas testified that when he finally let go

of the fence he was handcuffed and then "dragg[ed]" up the block, with one of the officers

pulling on his hair. Sookraj watched as the officers took Thomas up the block and heard Thomas

screaming "get off my hair." (Sookraj Tr. 17:5–6.)

There was also evidence that Thomas was treated for a fractured hand at the hospital.

Thomas's expert witness testified that his injury was consistent with Sookraj's testimony that

while Thomas was holding the fence, he observed an officer repeatedly hit Thomas's right hand

with what an object that "might have been a flashlight." (Sookraj Tr. 15:10–18.) The jury was

able to conclude, based on photographic evidence, that Dekoker was the one who struck Thomas

in the hand.[3]

In contrast, Sergeant Kelly and Officer Dekoker steadfastly denied that they or any of the

officers jumped Thomas, pulled his hair, or struck him anywhere on his hands, body, or legs.

(Dekoker Tr. 31:21–32:3, 57:11–22.) The only physical force that was used, Kelly said, was to

pull Thomas off the fence. (Kelly Tr. 56:25–57:12.) Dekoker denied ever striking Thomas's

hand with any object. He explained that what appeared to be a "shiny or metallic" object was the

silver reflective straps on his ski gloves. (Dekoker Tr. 31:4–15.)

The parties also told different versions of what happened once Thomas was handcuffed

and brought up the street. Thomas testified that the officers brought him "behind a car in the

---

[3] Thomas did not specifically state that he remembered being struck in the hand while at the fence, because he was being "hit all over" and "[t]here was a lot going on." (Thomas Tr. 17:15.) Thomas testified that, as a result of his fracture hand, he is unable to open some jars and ride his motorcycle over long distances. The jury also heard testimony that Thomas missed physical therapy sessions. This could explain why the jury found Dekoker liable for excessive force yet only awarded Thomas nominal damages. However, the excessive force claim could have also been independently premised on the jury's finding that Dekoker stepped on Thomas's hair to hold him down on the ground. For purposes of determining whether Dekoker was entitled to qualified immunity, the Court assumed that the excessive force claim was premised only on this latter ground.

snow by some garbage." (Thomas Tr. 19:21.) According to Thomas, the officers held him down

in the snow, laying head-down, for about forty-five minutes while, among other things, one of

the officers stood on the crown of his head and others stood on his legs:

> I was on the floor.  There was hitting going on – because I'm on the floor,
> I can't see nothing because my head is, you know, his foot is on my head
> so I can't turn my [head] I have people on my legs so I felt a few kicks.
> One officer, he was kicking snow in my face.  And I don't know if it was
> intentional or whatever, he was kicking snow in my face and he did kick
> me in my face.

(Thomas Tr. 24:19–25.)  The same officer who kicked snow in his face, Thomas said, also

"verbally tormented" him while he was on the ground:

> The coat I had on that evening, it had an Obama patch on it so I believe
> the officer must have saw it.  He said, what are you doing?  Sucking
> Obama's dick?  You think he's going to save you?  So, I cursed him out a
> little bit after that statement and he leans over in my face and he said, that's
> why we're going to rape your girlfriend when you leave.  I told him, if you
> rape my girlfriend you're going to be a dead as[s].

(Thomas Tr. 23:5–12.)

On the witness stand, Kelly denied ever saying anything "vulgar or derogatory" to

Thomas and emphasized that he would "never tolerate such misbehavior or misconduct from

anybody, any subordinate or any command." (Kelly Tr. 39:3–5, 61:2–3.) Kelly and Dekoker

each testified that they had to place Thomas on the ground because he was kicking at the officers

and that they placed Thomas "on his side" because that would "promote free and easy

breathing," (Kelly Tr. 59:18–23) and "allows the easiest breathing," (Dekoker Tr. 33:6–17).

Thomas testified that he became visibly upset and was yelling after hearing the verbal

threats to his girlfriend and after being wrapped in a restraint blanket and strapped to a stretcher.

Thomas admitted that he was cursing and not asking in "the most polite way," but explained that

he was confused and was trying to figure out what was going on. (Thomas Tr. 27:15–20.)

Thomas testified that at this point he felt "disrespected, violated, humiliated. Just like a piece of

trash pretty much." (Thomas Tr. 27:22–23.)

Non-party witness Debbie Busgith ("Busgith"), who lived on the same block as Thomas

and Marrow, testified that she observed a group of men beating up a man she at first thought was

a "bum" but later learned was Thomas:

> I looked up the block and then I heard noises coming from down the block
> so I moved and I looked down the block and then I saw a few guys just
> actually how they had one guy by the shirt and just threw him on the
> ground and they were just like punches and kicks going everywhere. . . .
> [S]omeone was getting beat up or something. . . They were . . . kicking
> and punching the guy on the floor. I thought it was a bum at the moment.

(Busgith Tr. 5:3–17.) Busgith also testified that she saw the "guy with the baseball cap," who

the jury later learned was Kelly "actually kicking the person down." (Busgith Tr. 8:9–11.)

Busgith said that she heard Thomas cry out in pain:

> When they were throwing him on the ground he was saying get the F off
> of me. And when they were kicking him he was roaring and saying ah and
> my fingers, my arms. . . The officers were telling him to shut the F up.

(Busgith Tr. 73:20, 74:12–14.)

Plaintiff's counsel showed the jury numerous eye-witness photographs of the scene,

wherein a handcuffed Thomas is laying head-down on the ground surrounded by several officers.

Two of the photos were particularly revealing. (See Exhibits 6E-1 and 6N-1.) According to

Thomas and other non-party witnesses, these photos depicted Dekoker stepping on Thomas's

dreadlocks and McAuliffe stepping on his legs. (Thomas Tr. 21:10–24, Busgith Tr. 18:2–3)

Even McAuliffe agreed that this was what the photos showed. (McAuliffe Tr. 20:10–11 (Q.

7

"And you were stepping on his leg, right?" A. "Yes."), 23:8–9 (Q. "Do you see Dekoker

stepping on Sean [Thomas's] hair?  Yes or no."  A. "Yes, I do.")).

However, when defense counsel questioned Dekoker about this on the witness stand, he

steadfastly denied ever standing on Thomas's head or hair:

> Q.  "Now, when the plaintiff was positioned sideways on the ground, did you
>     ever stand on his head?"
> A.  "I never stood on his head."
> Q.  "Did you ever stand on his hair?"
> A.  "I never stood on his hair."
> Q.  "Officer Dekoker, are absolutely certain that you never stood on his head
>     or his hair?"
> A.  "I'm positive.  I'm positive I never stood on his hair or his head."

(Dekoker Tr. 33:20–34:1.)  In addition, Dekoker did not see what McAuliffe and the other

witnesses saw in the photos.  (Dekoker Tr. 18:16–20.)  Asked if he agreed that the photo at least

showed him leaning down on his left leg (the leg closer to Thomas's head), Dekoker responded

that he was not leaning but that it just appeared that way "because that street is on a slant going

down."  (Dekoker Tr. 17:16–23.)  When Dekoker was subsequently asked if he saw in the

photograph the "braids coming out from the inside of your left foot," he replied, under oath:

> Those don't look like braids to me.  That looks like the street because I
> was standing there in the snow and I probably pushed the snow away. . . .
> That looks like a footstep to me.  That's my footstep."

(Dekoker Tr. 19:25–20–17.)   Asked why his foot was so close to Thomas's head,

Dekoker said: "I was standing there because there was [sic] footprints there and why [sic]

I had the best grip.  That way I didn't fall in the snow." (Dekoker Tr. 22:21–24.)

Similarly, Kelly did not agree that Exhibit 6E-1 showed Dekoker standing on Thomas's

hair.  (Kelly Tr. 40:10–15.)  And asked if he agreed that Exhibit 6N-1 showed Dekoker's foot on

Thomas's hair, Kelly said, under oath, he did not: "Yes, that is my testimony.  That is not his

8

foot on his hair." (Kelly Tr. 41:16–21.) Kelly emphasized he "would never allow such misconduct, such despicable misconduct from my subordinates under my command, ever." (Kelly Tr. 39:16–20.)

The jury concluded that there was no probable cause to arrest Thomas pursuant to Mental Hygiene Law § 9.41. The jury also concluded that the officers did not have probable cause to arrest Thomas for trespass, disorderly conduct, menacing, or obstructing governmental administration, and found Kelly liable for false arrest.[4] (Kelly testified that it was solely his decision to detain Thomas, a fact corroborated by the other officers.)

Through special interrogatories, it was clear that the jury did not find the defendant officers' testimony credible. The jury specifically found:

- Prior to Sergeant Kelly's decision to arrest Thomas, Thomas was not acting violently or threatening to act violently.

- Prior to Sergeant Kelly's decision to arrest Thomas, Thomas was not yelling irrationally or incoherently.

- Prior to Sergeant Kelly's decision to arrest Thomas, no officer reasonably believed that Thomas did not reside at the premises.

- The statement Thomas made was: "If y'all are gonna beat me up, then you're gonna have to kill me."

Based, in part, on these answers, the Court determined that Kelly was not entitled to qualified immunity for falsely arresting Thomas. The jury also concluded that excessive force was used against Thomas, and found Kelly, Dekoker, and McAuliffe liable; however, Thomas was

---

[4] As discussed in Part A., infra at footnote 5, these questions needed to be posed to the jury even though Thomas was not charged with any of these crimes.

9

awarded only nominal damages.  The Court determined that none of the officers was entitled to qualified immunity for their use of excessive force.[5]

Defendants Kelly, Dekoker, and McAuliffe now call the jury's verdict into question on several grounds.  First, Kelly contends that the false arrest verdict should be vacated and judgment should be entered as a matter of law in his favor, or a new trial should be granted, because the jury's verdict that Kelly did not have probable cause to arrest Thomas for trespass is against the weight of the evidence.  Second, Kelly, Dekoker, and McAuliffe contend that the excessive force verdict should be vacated and judgment should be entered as a matter of law in their favor, or a new trial granted, because the verdict was against the weight of the evidence.  Third, the defendants argue that the adverse inference charge given to the jury was erroneous and warrants a new trial.  Fourth, the defendants claim that they were unfairly surprised by the enlarged photographs used by Plaintiff's counsel at trial.  Fifth, the defendants seek a reduction of the jury's $125,000 compensatory damages award as excessive.  Sixth, the defendants argue that punitive damages award should be vacated or alternatively substantially reduced.


**DISCUSSION**

**A. The False Arrest Verdict**

The defendants do not contest the jury's findings that Kelly lacked probable cause to arrest Thomas under N.Y. Mental Hygiene Law § 9.41 or to arrest Thomas for disorderly

---

[5] Because of the "stark factual dispute about what happened" in this case, I found that the merits of Thomas's excessive force claim and the defendants' claim of qualified immunity both turned on whether the jury believed the plaintiff or the defendants.  None of the defendants' proposed special interrogatories on excessive force, if found to be true, would have aided the Court's qualified immunity inquiry on that issue.  See Robertson v. Sullivan, 07-cv-1416, 2010 WL 1930658, at *2 (E.D.N.Y. May 12, 2010).

conduct, menacing, or obstruction of governmental administration.[6]   However, defendants do

argue that the jury's finding that there was no probable cause to arrest Thomas for trespass

should be vacated, or in the alternative, that there should be a new trial, for three reasons: (1) the

jury's finding was against the weight of the evidence; (2) the special interrogatory concerning

trespass was flawed and, if properly drafted and answered consistent with the weight of the

evidence, would have led the Court to grant Sergeant Kelly qualified immunity; and (3) the

jury's answer to the special interrogatory was foreclosed by the "law of the case" doctrine.   The

Court addresses each argument in turn.

1. Standard of Review

A party is entitled to judgment as a matter of law if "a party has been fully heard on an

issue during a jury trial and the court finds that a reasonable jury would not have a legally

sufficient evidentiary basis to find for the party on that issue."   Fed. R. Civ. P. 50(a)(1); see also

Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 149 (2000).   In making this

---

[6] The defendants do complain about the lack of a special interrogatory regarding probable cause to arrest Thomas for disorderly conduct, stating that the Court should have asked the jury, "Did plaintiff cause a disturbance by yelling and screaming in the presence of any of the police officers on the scene?," which, they argue, would have given Kelly "grounds to arrest plaintiff for disorderly conduct." (Post-Trial Motion at 12 n.3.)   However, this argument is incorrect because one can still cause a public disturbance without acting with the mens rea required in the statute. See N.Y. Penal Law § 240.20; People v. Richardson, 913 N.Y.S.2d 549, 552 (Crim. Ct. 2010). In any event, the incident occurred at around 2:30 a.m. on a residential street, and there was no evidence of any "public disturbance." See Richardson, 913 N.Y.S. 2d at 553. To the extent the defendants argue that their proposed question would have aided the qualified immunity inquiry, the Court disagrees.   In determining that there was no probable cause to arrest Thomas for disorderly conduct, the jury necessarily found that Thomas was not "making unreasonable noise" or "using abusive or obscene language"; that his conduct was not "public in nature"; or that he did not intend "to cause a public inconvenience" (or "conscious[ly] disregard [] a substantial and unjustifiable risk" thereof). See id. § 240.20. This finding was reasonable in light of ample testimony that Thomas was not yelling and screaming prior to Kelly's decision to arrest him.   Because qualified immunity is not an opportunity for defendants to have the jury revisit reasonable verdicts, the Court found that this question would not aid the qualified immunity inquiry. See Robertson, 2010 WL 1930658, at *4.

determination, it is well-settled that the court "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Id. at 150. The court should review the record as a whole, but "it must disregard all evidence favorable to the moving party that the jury is not required to believe." Id. at 151. "That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses." Id. (internal quotation marks and citation omitted). It is also well-settled in this Circuit that courts "will overturn a verdict only if there is 'such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or such an overwhelming amount of evidence in favor of the [moving party] that reasonable and fair minded men could not arrive at a verdict against [the moving party]." Gronowski v. Spencer, 424 F.3d 285, 292 (2d Cir. 2005) (quoting LeBlanc-Sternberg v. Fletcher, 67 F.3d 412, 429 (2d Cir. 1995)).

A party is entitled to a new trial under Fed. R. Civ. P. 59 "only if [the court] is convinced that the jury has reached a seriously erroneous result, or that the verdict constitutes a miscarriage of justice." Wong v. Mangone, 450 Fed. Appx. 27, 31 (2d Cir. 2011) (citing Smith v. Lightning Bolt Prod., 861 F.2d 363, 370 (2d Cir. 1988)). In contrast to a motion for judgment as a matter of law, "a new trial may be granted even if there is substantial evidence to support the jury's verdict," and "a trial judge hearing a motion for a new trial is free to weigh the evidence himself and need not view it in the light most favorable to the verdict winner." Song v. Ives Labs., Inc., 957 F.2d 1041, 1047 (2d Cir. 1992) (internal quotation marks and citations omitted). However, in making this determination, the court must bear in mind that if "the resolution of the issues depended on assessment of the credibility of the witnesses, it is proper for the court to refrain

12

from setting aside the verdict and granting a new trial." Piesco v. Koch, 12 F.3d 332, 345 (2d Cir. 1993) (quoting Metromedia Co. v. Fugazy, 983 F2d 350, 363 (2d Cir. 1992)).

## 2. Relevant Law

A claim for false arrest is based on the Fourth Amendment right of an individual to be free from unreasonable seizures, which includes a right not to be taken into custody by police officers, without probable cause. Jaegly v. Couch, 439 F.3d 149, 151 (2d Cir. 2006). A police officer makes a lawful arrest when he or she acts with probable cause that a person is committing or has committed a crime. See id. at 152. By contrast, a police officer commits a false arrest if he or she arrests a person without probable cause. The only issue relevant to the instant motion is whether Kelly had probable cause to arrest Thomas for trespass.[7]

Probable cause exists when an officer has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient so that an officer of ordinary intelligence, judgment, and experience can reasonably believe that the person to be arrested has committed or is committing a crime. Id. Because Thomas was arrested without a warrant, Kelly had the burden of proving by a preponderance of the evidence that probable cause existed for Thomas to be arrested for trespass. See Golub v. City of New York, 334 F.Supp. 2d 399, 404 (S.D.N.Y. 2004) (citing Wu v. City of New York, 934 F. Supp. 581, 586 (S.D.N.Y. 1996)).

---

[7] In Devenpeck v. Alford, 543 U.S. 146, 153 (2004), the Supreme Court "rejected the view that probable cause to arrest must be predicated upon the offense invoked by the arresting officer, or even upon an offense 'closely related' to the offense invoked by the arresting officer." Jaegly v. Couch, 439 F.3d 149, 154 (2d Cir. 2006). Devenpeck clarified that probable cause depends on the facts known to the arresting officer at the time of the arrest and not the arresting officer's "subjective reason for making the arrest." Id. (quoting Devenkpeck, 543 U.S. at 153). Following Devenpeck, the Second Circuit held that a false arrest claim is barred "so long as the arresting officer had probable cause to arrest the plaintiff for some crime," regardless whether any charges were "actually invoked at the time of arrest." Id. In this case, even though there was technically never a "time of arrest," because Thomas was detained pursuant to a civil commitment statute and not for any violation or crime, Judge McMahon found that the Devenpeck rule applied.

13

Under Section 140.05 of the N.Y. Penal Law, Kelly had probable cause to arrest Thomas for trespass if he (or another officer involved in the arrest) had reasonable cause to believe that Thomas "knowingly enter[ed] or remain[ed] unlawfully in or upon premises"—i.e., the premises of 1748 Eastburn Avenue, Apartment 2.

3. Analysis

The defendants' primary contention that Thomas was trespassing because he refused to leave the premises after Marrow asked him to leave is unavailing because whether Marrow asked Thomas to leave is legally irrelevant to whether Thomas committed a trespass. At trial, it was established that Thomas lived in the apartment with Marrow, although his name was not on the lease. Since Thomas lived in the apartment, he could not have been arrested for trespassing there. See Davis v. City of New York, 10-cv-699 (SAS), 2012 WL 4813837, at *8 (S.D.N.Y. Oct. 9, 2012) (finding that NYCHA rule prohibiting "trespassing" in certain areas of a housing project cannot plausibly be read to apply to residents of the building); see also Minnesota v. Carter, 525 U.S. 83, 95 (1998) (recognizing that legal protections inure to residents of a home "even when they merely occupy it rent free—so long as they actually live there") (emphasis in original). The defendants cite to no authority for the proposition that an individual's lawful presence in the apartment in which he resides becomes unlawful the instant that a roommate, whose name is on the lease, requests that person to "leave." Nevertheless, because probable cause is based on the "facts and circumstances" known to officers "as of the moment of the arrest," if Kelly (or another officer at the scene) reasonably believed that Thomas did not live at the premises, then it would have been reasonable to believe that Marrow could legally revoke Thomas's permission to be there. Accordingly, as Judge McMahon stated in a prior opinion in this case, for Kelly "[t]o have probable cause to believe that Thomas was trespassing, the officers

14

must have known that Thomas did not live in the apartment." Thomas v. City of New York, 09-cv-3162 (CM), 2010 WL 5490900, at *11 (S.D.N.Y Dec. 22, 2010); see also Finigan v. Marshall, 574 F.3d 57, 62 (2d Cir. 2009) (finding probable cause existed to arrest plaintiff for trespass where the defendant sheriff "knew . . .that [plaintiff] no longer resided at the premises").

Here, on a special interrogatory, the jury specifically determined that none of the "officer[s] reasonably believe[d] that Thomas did not reside at the premises." To set aside this finding the defendants must show that the jury had no "legally sufficient evidentiary basis to reach this conclusion." See Fed. R. Civ. P. 50(a)(1); Reeves, 530 U.S. at 149. Here, the only evidence before the jury that the officers believed that Thomas did not live the apartment came from Kelly's testimony, when he stated that Marrow "was telling us that [Thomas] did not live there." (Kelly Tr. 52:1–52:9.) This testimony did not come from a disinterested witness and was not corroborated by any of the other officers. See Reeves, 530 U.S. at 151. The jury could have cast doubt on this testimony in light of Kelly's later statement that Marrow was "not cooperative" to such a degree that he was "unaware of exactly what happened in [Marrow's] apartment." (Kelly Tr. 73:11–13.) The jury could also have been skeptical that Marrow would have told Kelly that Thomas did not live with her when in fact he did.   In short, because the jury was not required to believe Kelly's testimony, the Court must disregard it when evaluating whether the defendants can set aside the jury's finding on this issue. See id.

The jury also heard evidence that the defendants, including Kelly, knew that Thomas kept his personal belongings at Marrow's apartment because they were watching as he packed up multiple bags of his clothes. The officers also were aware that the 911 call that brought them to the scene complained of a domestic violence dispute, as opposed to an argument involving strangers, for example. Kelly himself acknowledged that based on his experience as a police

15

officer, most "domestic violence situations" involve "a lot of emotions" because "these people love each other and they're having a bad night and it is very unfortunate." (Kelly Tr. 75:12–16.)

In addition, according to defendant Lennox Corlette, one of the first officers to arrive on the scene, Sookraj, the downstairs neighbor, told him that Thomas and Marrow's arguing "is a continuous thing[] that happens all the time." (Corlette Tr. 26:13.)  While not dispositive of the issue at hand, drawing all reasonable inferences in favor of Thomas, as the Court is required to do, a reasonable jury could infer from these facts that the Kelly and other officers knew that Thomas lived in the apartment with Marrow.  At the very least, the jury had a "legally sufficient basis" to reach the conclusion that Kelly failed to meet his burden that he reasonably believed that Thomas did not live in the apartment with Marrow.

Furthermore, defendants' contention that Thomas was trespassing because he refused to leave after Marrow asked him to relies on facts that were disputed at trial and must now be resolved in favor of Thomas.  For example, Marrow testified that she never asked Thomas to leave but rather only wanted him to go out "to get some air."  (Marrow Tr. 13:17–18).  It is not the Court's role to make credibility determinations or weigh the evidence at this stage.  See Reeves, 530 U.S. at 150.  The jury was not required to believe the officers' testimony over Marrow's.  In addition, the evidence adduced at trial demonstrated that Thomas was already outside the premises when Sookraj overheard Marrow say she wanted Thomas "leave or have him out of her apartment."  (Sookraj Tr. 34:24–35:1.)  The jury had a sufficient basis to conclude either that Marrow did not ask Thomas to leave or that, even if she did, Thomas no longer remained on the premises when she did.  Thus, the jury's verdict was amply supported by the evidence.  The only evidence that the defendants point to in their favor is evidence that the jury was entitled to reject.  Accordingly, the defendants have not met their burden to set aside the

16

verdict as against the weight of the evidence, and they are not entitled to judgment as a matter of law.

Kelly is also not entitled to a new trial on this basis because the jury did not reach a "seriously erroneous" result and the verdict was not a "miscarriage of justice." See Wong, 450 Fed. Appx. at 31. Although the Court can weigh evidence itself and need not view the evidence in the light most favorable to Thomas, it is not proper to set aside the verdict and grant a new trial where, as here, "the resolution of issues depended on an assessment of the credibility of the witnesses." See Piesco, 12 F.3d at 345.

The defendants' next contention in support of setting the aside the jury's false arrest verdict is that the special interrogatory "concerning trespass was flawed and, if properly drafted and answered consistent with the weight of the evidence, would have led the Court to grant Sergeant Kelly qualified immunity." Specifically, the defendants argue that the special interrogatory regarding trespass was "incomplete" because the Court did not additionally ask whether "Thomas was only residing at Ms. Marrow's apartment with her permission," and, if so, whether "any officer reasonably believe[d] that Ms. Marrow revoked such permission." However, there was no testimony presented at trial that Thomas was "only residing at Ms. Marrow's with her permission"—as opposed to merely residing with Marrow, which is what the special interrogatory asked. Neither party provided evidence or even suggested that Thomas was residing with Marrow without her permission. And, even if the jury thought that Marrow's permission was relevant to the trespass question, this would not have made it true as a legal matter. Thus, asking the now-proposed special interrogatories would not have aided the Court's qualified immunity inquiry.

17

Moreover, the defendants had ample opportunity to request the particular questions they now propose; yet they chose not to. In their moving papers, defendants state that they "proposed a lengthy set of Special Interrogatories that would have asked this follow-up question, but the Court rejected defendants' interrogatories and crafted its own." (Defendants Kelly, Dekoker, and McAuliffe's Post-Trial Motion Pursuant to Rules 50 and 59 of the Fed. R. Civ. P. [hereinafter, "Post-Trial Motion"] at 12 n.3.) This assertion is patently false. It is true that the defendants proposed a lengthy set of special interrogatories, but the questions they now propose were not on the list. The only questions defendants asked that arguably related to the issue of trespass were:

"1. Did the officers request plaintiff to leave the scene?;"

"2. Did plaintiff refuse to leave the scene?;" and,

"3. Did plaintiff ignore the officers' request for plaintiff to let go of the fence?"

(See Sundaran Decl., Exhibit "M," Defendants' Proposed Special Interrogatories.)

Because qualified immunity is an affirmative defense, "the defendant bears both the burden of proof and the obligation to request the specific factual interrogatories that would be necessary to enable the court to make the appropriate legal determination." Ellis v. La Vecchia, 567 F. Supp. 2d 601, 609 (S.D.N.Y. 2008) (citing Zellner v. Summerlin, 494 F.3d 344, 368 (2d Cir. 2007)) (emphasis added). "To the extent that a particular finding of fact is essential to a determination by the court that the defendant is entitled to qualified immunity, it is the responsibility of the defendant to request that the jury be asked the pertinent question. . . . If the defendant does not make such a request, he is not entitled to have the court, in lieu of the jury, make the needed factual finding." Id. (quoting Zellner, 494 F.3d at 368) (emphasis added). None of the questions the defendants proposed had anything to do with whether Marrow gave Thomas "permission" to live with her. If, as defendants seem to argue, this "particular finding of

18

fact" would entitle Kelly to qualified immunity, then it was defendants' obligation to request it.

See Zellner, 494 F.3d at 368.  Since they did not, the Court will not make this factual finding for

them now.  See id.

The defendants' final contention in support of setting aside the jury's false arrest verdict

is that the jury's answer to the special interrogatory is foreclosed by the "law of the case"

doctrine.  The law of the case doctrine "'posits that when a court decides upon a rule of law, that

decision should continue to govern the same issues in subsequent stages in the same case.'"

Pescatore v. Pan Am. World Airways, Inc., 97 F.3d 1, 7-8 (2d Cir. 1996) (emphasis added).  The

doctrine is "admittedly discretionary and does not limit a court's power to reconsider its own

decisions prior to final judgment."  Id. at 8.  Here, defendants point to a statement made by Judge

McMahon in her decision on the parties' cross-motions for partial summary judgment.  Based on

the record before her, Judge McMahon found that "[t]he facts known to the officers establish that

Thomas did not live in the apartment."  Thomas, 2010 WL 5490900, at *11.  The defendants

argue that the Court should "adhere" to Judge McMahon's finding, "despite the jury's finding

that no reasonable officer could have believed that plaintiff did not reside in the apartment."

(Post-Trial Motion at 11.)  This argument not only misinterprets the law of the case doctrine—

which applies to a "rule of law," not a factual determination, see Pescatore, 97 F.3d at 7–8—but

also ignores the actual factual basis for Judge McMahon's finding.  Judge McMahon's assertion

was made on the record existing at the time of the summary judgment motions and was based

solely upon the deposition testimony of Chandrowtie Matabeek, who is the mother of Ravi

Sookraj.  See Thomas, 2010 WL 5490900, at *11 ("Thus, based on Matabeek's testimony, the

officers knew that Thomas did not live in the apartment.").  Fatal to the defendants' position is

the fact that Matabeek did not testify at trial, nor was her deposition testimony introduced to the

jury. See Ortiz v. Jordan, 131 S.Ct. 884, 889 (2011) ("Once the case proceeds to trial, the full

record developed in court supersedes the record existing at the time of the summary judgment

motion."). Therefore, nothing "foreclosed" the jury's answer to the special interrogatory.


## B. Excessive Force Verdict

The defendants argue that the excessive force verdict is against the weight of the

evidence. The Court disagrees. Viewing the facts in the light most favorable to Thomas, there

was evidence that Dekoker and McAuliffe held Thomas down by stepping on his hair and legs,

respectively. Contrary to the defendants' assertion, Dekoker did not testify that "he never

intentionally stepped on plaintiff's hair or head." In fact, the portion of the testimony that

defendants cite for this assertion, went as follows:

> Q.   "Now, when the plaintiff was positioned sideways on the ground,
>      did you ever stand on his head?
> A.   "I never stood on this head."
> Q.   "Did you ever stand on his hair?"
> A.   "I never stood on his hair."

(Dekoker Tr. 33:18–22). Although the defendants chose not to cite to the very next question

posed to Dekoker, it happens to make their assertion even less persuasive:

> Q.   "Officer Dekoker, are you absolutely certain that you never stood
>      on his head or his hair?"
> A.   "I'm positive. I'm positive I never stood on his hair or his head."

(Dekoker Tr. 33:23–34:1.) The defendants' statement that Dekoker's "testimony makes clear

that this act was accidental" is belied by the very testimony to which they cite. (See Post-Trial

Motion at 30.) Even if this testimony were somehow construed to allow for the possibility that

Dekoker was accidentally standing on Thomas' hair, the jury did not have to believe it. It is

implausible that Dekoker could have been unknowingly standing on Thomas's hair at the same

time as Thomas was writhing about and trying to kick the officers, as defendants claim he was: if Thomas felt his hair being stepped on, Dekoker would have probably known about it. Additionally, giving every favorable inference to Thomas, the evidence showed that Dekoker struck Thomas's hand with a blunt object, causing it to fracture.

With regard to McAuliffe, the jury was not required to believe his testimony that he stepped on plaintiff's leg only to prevent plaintiff from kicking the officers. The evidence demonstrated that Thomas was not resisting at this point because he was laying chest-down on the ground, in handcuffs, and surrounded by several officers. It is difficult to conceive of how Thomas could have managed to kick the officers from his defenseless position on the ground.

With regard to Kelly, Busgith testified that she saw officers, including Kelly, punching Thomas and "kicking him further down" to the ground. Thomas testified that Kelly kneed him in the face. Moreover, as the supervising officer in close proximity to the situation (as the photos showed), there was sufficient evidence for the jury to conclude that Kelly was aware of Dekoker and McAuliffe's excessive use of force, yet failed to intervene to stop it. See O'Neill v. Krzeminski, 839 F.2d 9, 11 (2d Cir. 1988). Accordingly, the Court denies the defendants' motion for a judgment as a matter of law or a new trial on the excessive force verdict.


**C. Adverse Inference Charge**

Defendants also argue that the Court should grant Defendants Kelly, Dekoker, and McAuliffe a new trial because they were unduly prejudiced by "the Court's erroneous adverse inference instruction concerning the missing Aided Card." Specifically, Defendants argue that (1) Plaintiff failed to show that the contents of the missing Aided Card would support his false arrest claim, and (2) the adverse inference instruction should have specified the individual

21

officers who had a duty to preserve the Aided Card rather than using the word "defendants" generally.  The adverse inference instruction read as follows:

> In this case, there has been evidence that an Aided Card was created by defendant Dekoker in response to the December 20, 2008 incident.  An Aided Card is a police created document which is typically used when an incident occurs within the City of New York which records a description of the incident and the police response to it.  Because the defendants did not produce his document you may infer, but are not required to, that the content of the Aided Card would be inconsistent with the defenses offered by the defendants to the plaintiff's claims in this action.

1. Relevant Law

"[A] party seeking an adverse inference instruction based on the destruction of evidence must establish (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." Chin v. Port Auth. of New York & New Jersey, 685 F.3d 135, 162 (2d Cir. 2012) (quoting Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 107 (2d Cir.2002)).  "If these elements are established, a district court may, at its discretion, grant an adverse inference jury instruction insofar as such a sanction would 'serve . . . [the] threefold purpose of (1) deterring parties from destroying evidence; (2) placing the risk of an erroneous evaluation of the content of the destroyed evidence on the party responsible for its destruction; and (3) restoring the party harmed by the loss of evidence helpful to its case to where the party would have been in the absence of spoliation.'" Id. (quoting Byrnie v. Town of Cromwell, 243 F.3d 93, 107 (2d Cir.2001)).  Finally, if it is clear that an erroneous jury charge did not influence the jury's verdict, then the error was harmless and a new trial is not required.  Boyce v. Soundview

Technology Group, Inc., 464 F.3d 376, 390 (2d Cir. 2006) (quoting LNC Invs., Inc. First Fidelity

Bank, N.A., 173 F.3d 454, 460 (2d Cir. 1999) (quotation marks omitted)).

 "The court's role in evaluating the 'relevance' factor 'is limited to insuring that the party

seeking the [adverse] inference ha[s] adduced enough evidence of the contents of the missing

materials such that a reasonable juror could find in its favor.'" Poux v. County of Suffolk, 09

CV 3081 SJF WDW, 2012 WL 1020302 (E.D.N.Y. Mar. 23, 2012) (quoting Residential

Funding, 306 F.3d at 109 n.4). "Such a showing can be made on the basis of extrinsic evidence."

Orbit One Communications, Inc. v. Numerex Corp., 271 F.R.D. 429, 438 (S.D.N.Y. 2010)

(citing Residential Funding, 306 F.3d at 109). Where, as here, the missing records were

allegedly destroyed negligently (as opposed to with a higher degree of culpability), "[i]t is not

sufficient for the moving party merely to point to the fact that the opposing party has failed to

produce requested information." See id. at 439 (citing Mitchell v. Fishbein, No. 01 Civ. 2760,

2007 WL 2669581, at *5 (S.D.N.Y. Sept. 13, 2007)). In other words, the moving party must

base its relevancy argument upon something more than "pure speculation." See Sovulj v. United

States, No. 98 CV 5550, 2005 WL 2290495, at *5 (E.D.N.Y. Sept. 20, 2005). At the same time,

although the party requesting the adverse inference charge bears the burden of showing its

favorability, "the burden placed on the moving party to show that the lost evidence would have

been favorable to it ought not be too onerous, lest the spoliator be permitted to profit from its

destruction." Orbit One Communications, 271 F.R.D. at 440 (citing Residential Funding, 306

F.3d at 109).

2. Analysis

 Plaintiff did not fail to show that the contents of the missing Aided Card were relevant to

his false arrest claim. Dekoker testified that the Aided Card "would have mentioned why we

brought [Plaintiff] to the hospital." (Dekoker Tr. 7:14–9:20, 24:23–26:7).  Specifically, Dekoker testified that:

> [O]n the back of the card is specific events, a box for people who we deem emotionally disturbed, and in that box you write down several things that stick out that would make an officer characterize someone as an emotionally disturbed person and certainly would include the irrational behavior, you would certainly include Mr. Thomas telling the police to shoot him, and you would include the intoxicated because these are all factors that the hospital staff look at, that they're going to, you know, use to help them with whatever doctors do in the hospital.

(Dekoker Tr. 25:9–18.)  Plaintiff's entire theory of the case and all the testimony marshaled in support of it—which the jury evidently accepted—relied on the premise that the reasons claimed by the officers for brining Thomas to the hospital were pretextual—that is, that Thomas did not in fact appear to be suffering from a mental illness.  To the extent the jury found Dekoker lacked credibility, of which sufficient evidence existed, the jury was entitled to consider his dishonesty as "affirmative evidence" that the Aided Card's content would have been favorable to Thomas.  See Reeves, 530 U.S. at 147 ("[A] general principle of evidence law [is] that the factfinder is entitled to consider a party's dishonesty about a material fact as "affirmative evidence of guilt.") (citing Wright v. West, 505 U.S. 277 (1992)).[8]

The jury could also reasonably infer that the information on the Aided Card, which Dekoker filled out closer in time to the underlying incident and before he had an opportunity to confer with his co-defendants, contains a more accurate, unbiased, and substantially different account of why Plaintiff was taken to the hospital—and that this account would have contradicted Dekoker's testimony at trial.  For example, if the Aided Card did not mention

---

[8] For the same reason, the jury could have disbelieved Dekoker's testimony that he submitted the Aided Card exactly as he was required to, and instead inferred that Dekoker negligently misplaced it.

24

anything about the "suicidal" statement, or mentioned the statement but phrased it like Thomas claims he said it, then this omission or alteration would favor Thomas's case. Thomas is not merely pointing to the fact that the Aided Card was missing as proof that its contents would support his case. Rather, Thomas has directly refuted through his own testimony and through the testimony of neutral witnesses precisely that which Dekoker claims he wrote on the Aided Card. Considering that Dekoker was not a credible witness, to require more from Plaintiff under these circumstances would allow "the spoliator . . . to profit from [the Aided Card's] destruction." See Orbit One Communications, 271 F.R.D. at 440.

Next, the defendants argue that the adverse inference instruction was erroneous because it should have specified the individual officers who had a duty to preserve the Aided Card rather than using the word "defendants" generally. At the jury charge conference, the defendants maintained that Dekoker was not responsible for the missing Aided Card because "he placed it in a basket in the desk in the precinct which is what he was required to do." (Charge Conference Tr. 19:20–21.) Their position, at least implicitly, removes the responsibility away from Dekoker and places it on an unnamed employee of the police department, and, in turn, the City of New York ("the City"). Although the City was a named defendant in the case, the defendants did not want the jury to know this for fear it would possibly factor into its verdict.

The Court determined that it was appropriate to hold the City responsible for the missing Aided Card with respect to the adverse inference charge. Otherwise, a police officer could inappropriately abdicate his or her responsibility to preserve evidence by merely asserting without corroboration, as Dekoker did here, that it was given to another City employee. This result, especially where the City itself was a defendant in the case, would frustrate the "threefold purpose" of the adverse inference sanction to "deter[] parties from destroying evidence, plac[e]

25

the risk of an erroneous evaluation of the content of the destroyed evidence on the party

responsible for its destruction; and, restor[e] the party harmed by the loss of evidence helpful to

its case to where the party would have been in the absence of spoliation." See Chin, 685 F.3d at

162.

      Thus, in overruling the defendants' objection to the wording of the adverse inference

charge, I stated:

> [I]f this jury knew that the City were in the case you would be hard
> pressed to make this same argument [that the City was not legally
> responsible for the missing Aided Card]. It seems paradoxical to say that I
> shouldn't give the instruction because you asked me to make sure the jury
> doesn't know that the City was in this case whereas if the jury knew that
> the City was in this case this instruction would certainly be appropriate, at
> least in terms of this argument.

(Charge Conference Tr. 20:23–21:8.)[9] Since the defendants objected to any reference to the City

as a defendant in this case, the Court instead used the term "defendants" generally. Therefore,

the defendants' current claim that the adverse inference charge "should have run against the City

of New York, and not any individual defendant officer" is specious. (See Post-Trial Motion at

19.)

      The defendants seem to argue that because the sanction of the adverse inference charge

should penalize only those parties with a duty to maintain and preserve the Aided Card, that it

therefore follows that no adverse inference charge should have been given in this case. But this

ignores the fact that Dekoker created the Aided Card and had it within his control when the duty

---

[9] Defense counsel maintained that they would still object to having the charge against the City but conceded that
they would not have "as strong an argument but there is still an argument to make even under that circumstance."
(Charge Conference Tr. 21:9–11.)

to preserve it arose.[10]  Although the exact contours of a police officer's duty to generate and

submit an Aided Card were not substantiated at trial, the jury was not required to believe

Dekoker's uncorroborated assertion that he submitted the Aided Card exactly as required, and

thus could reasonably infer that Dekoker had a role in failing to preserve it.  See Reeves, 530

U.S. at 147.  Contrary to the defendants' contention, this would not be a situation where a

plaintiff seeks to impute conduct of a governmental department to an individual government

official who played no role in creating or maintaining the evidence in question.  Compare Grant

v. Salius, 09-cv-21 (JBA), 2011 WL 5826041, at *2 (D. Conn. Nov. 18, 2011) (no adverse

inference instruction where plaintiff could not show that any of the individual defendants, as

opposed to correction facility where defendants worked, "had any control over the recordings,

any duty to maintain them, or were in any way involved in the failure to preserve them"); Field

Day, LLC v. County of Suffolk, 04-cv-2202, 2010 WL 1286622, at *13 (E.D.N.Y. Mar. 25,

2010) (no adverse inference charge where plaintiffs failed to show that individual defendants, as

opposed to the County, actually spoliated evidence).  Therefore, in addition to holding the City

responsible for the missing Aided Card, it likely would have been appropriate to hold Dekoker

responsible for failing to preserve evidence he at one time controlled and had a duty to maintain.

  In any event, even assuming, arguendo, that the adverse inference charge was erroneous,

a new trial is not warranted because the error was harmless.  The adverse inference charge

provided, in relevant part:

> Because the defendants did not produce this document you may infer, but
> are not required to, that the content of the Aided Card would be
> inconsistent with the defenses offered by the defendants to the plaintiff's
> claims in this action.

---

[10] Thomas filed a complaint with the IAB the next day.  It is not clear from the testimony when Dekoker allegedly
put the Aided Card in the basket at the police precinct.  Regardless, no objection was made on this basis.

Kelly and McAuliffe could not have been unfairly penalized by a jury's finding that "the content of the Aided Card would be inconsistent with the defenses offered by [Dekoker]," since the "defenses offered by [Dekoker]" were the same defenses offered by Kelly and McAuliffe: namely, that probable cause existed to arrest Thomas in order to transport him to a hospital for a psychiatric evaluation because his behavior was consistent with that of an emotionally disturbed person who posed a danger to himself or others. If the jury found that "the content of the Aided Card" indicated that Thomas was not irrational or incoherent, or that he did not make a suicidal statement, then this inference would necessarily have cast doubt on Kelly's and McAuliffe's defenses as well, regardless of whether the adverse inference charge referred to "Dekoker" or "defendants."

Moreover, the adverse inference charge was harmless because it is clear that it did not influence the jury's verdict. The content of the Aided Card was relevant only to Thomas's claim for false arrest. This is because the information on the Aided Card would have provided the reasons for taking Thomas to the hospital—that is, it would have described Thomas's behavior. While Thomas's behavior was relevant to defendants' false arrest defense, it was not relevant to their defense of the excessive force claim: the defendants denied ever hitting Thomas or stepping on his hair and legs. In other words, instead of arguing that the force used was justified under the circumstances, they claimed that the alleged force was not used at all. As such, as the only officer found liable for falsely arresting Thomas, Kelly is the only defendant potentially prejudiced by the adverse inference charge. However, it was apparent from the uncontroverted testimony given at trial that the reason Kelly was found liable for false arrest, but not the other defendants, was that it was solely his decision to arrest Thomas and declare him an emotionally

28

disturbed person.  In light of that evidence, it was clear that the adverse inference charge had no influence on the jury's false arrest verdict against him.  See Boyce, 464 F.3d at 390. Accordingly, the Court denies the defendants' request to grant Defendants Kelly, Dekoker, and McAuliffe a new trial based on the adverse inference charge.


**D. Photographic Exhibits**

The defendants also contend that the Court should grant Defendants Kelly, Dekoker, and McAuliffe a new trial because they were "unduly surprised" by "plaintiff's counsel's use of, and display to the jury of, enlarged, lightened photographs that purportedly show far more detail then [sic] photographs originally furnished to defense counsel." (Post-Trial Motion at 20.)  As described in Defendants' moving papers:

> Exhibits 6E and 6N on the parties' trial exhibit are 8 x 10 photographs depicting plaintiff on the ground and officers around him.  However, the poster-size enlargements that plaintiff's counsel prepared for trial and used at trial – Exhibits 6E-1 and 6N-1 – purportedly show significantly more detail than their smaller counterparts.  For example, Exhibit 6E-1 purportedly shows where plaintiff's hair was in relation to Officer Dekoker's foot, whereas Exhibit 6E is too dark to distinguish these features.  . . . Likewise, Exhibit 6N-1 purportedly shows plaintiff's head, face and hair as he is lying on the ground; Exhibit 6N does not . . . .

(Post-Trial Motion at 21) (emphasis added).  Defendants continue:

> Only when plaintiff's witnesses began testifying about what was depicted in the enlargements did defense counsel realize that 6E-1 and 6N-1 purportedly show significantly more detail on the issue of whether Officer Dekoker stepped on plaintiff's hair of head.  As but one example of the harm created by this unfair surprise, Officer McAuliffe, shown Exhibit 6E-1, testified that it depicted Officer Dekoker stepping on plaintiff's hair [citation omitted] – testimony that would never have been elicited had the witness testified about Exhibit 6E, which is too dark and indistinct to show such detail.

(Post-Trial Motion at 21) (emphasis added).

A court may grant a new trial where undue surprise deprives a party of a fair hearing. Brady v. Chemical Construction Corp., 740 F.2d 195, 200 (2d Cir. 1984). At the same time, objections must be timely; it must be made as soon as the applicability of it is known to the opponent. Camrex Contractors (Marine) Ltd. v. Reliance Marine Applicators, Inc., 579 F. Supp. 1420, 1424 n. 6 (E.D.N.Y. 1984).

Plaintiff cites to a case from the First Circuit Court of Appeals that is on point. In Lubanski v. Coleco Indusutries, Inc., the appellants argued that the district court committed error by allowing "a series of photographic enlargements portraying a staged version of the accident scene" on the ground that "they depicted a distorted view and thus were grossly prejudicial." 929 F.2d 42, 47 (1st Cir. 1991). The First Circuit noted that the appellant was aware before trial that his adversary intended to use the original, smaller-sized photographs, and that the appellant failed to timely object to the admissibility of the enlargements. Id. at 48. Based on the latter "fact alone," the First Circuit concluded that no error occurred below. Id. Moreover, the court found that any error would have been harmless because the appellant was able to cross-examine the witness "regarding any discrepancies between the actual scene and his staged version." Id.

Here, defendants argue that the enlarged photos were "altered" and were thus unfairly prejudicial. However, like in Lubanksi, the defendants were aware before trial that Plaintiff intended to use the original, smaller-sized photographs, and they failed to object when Plaintiff introduced the enlargements into evidence. (See Busgith Tr. 70:17.) The defendants were shown Exhibits 6E-1 and 6N-1 and had an opportunity to compare them with Exhibits 6E and 6N before they were shown to the jury and before any witness was questioned concerning their contents. Only after Plaintiff rested his case did the defendants object to them. In overruling

their objection, the Court gave the defendants an opportunity to eliminate any potential prejudice by making make their own enlargements and to recall witnesses if necessary:

> You have these photos. We no longer live in the days of mimeograph machines. If you wish to blow up the photos yourself and have a witness testify to those, to your blow ups and point out differences, you're welcome to do that, but I'm going to overrule that objection. But, yes, if you think this is not a fair and accurate depiction of this, that's fine, but the witness[es] ha[ve] testified that this is a fair and accurate depiction of what they had observed and we told the jury this was a blown up image of this. If you have issues with that then, again, you can blow up your own photos, you can call the witness to authenticate those, and you can make whatever arguments you need to make. I think that would eliminate any prejudice that you're talking about.

("Blow Up" Bench Conference Tr. 4:15–5:2.) Although the defendants subsequently made their own enlargements, they chose not to introduce them into evidence or recall any witnesses.

The defendants contend that Lubanski is distinguishable from the case at bar because the appellants in that case did not claim that the enlargements "altered" the originals, like the defendants are claiming here. However, in this case, the enlarged photos were only allegedly "altered" insofar as the "dark and indistinct" photos were "lightened" and made to show "more detail." While a party can be unfairly surprised due to distortion or manipulation, "unfair surprise" due to accuracy is a much harder argument to make—emphasis on "unfair." At bottom, the defendants are asking the Court to grant Kelly, Dekoker, and McAuliffe a new trial because defense counsel were "unfairly surprised" by Plaintiff's use of photographs that allowed the jury to better see what actually occurred. Evidently, defense counsel were comfortable relying on photos that were "too dark and indistinct" to show what actually occurred while arguing to the jury that their clients did not commit the wrongful acts alleged.[11] Defense counsel

---

[11] Even if the defendants were satisfied with the clarity, or lack thereof, of the photographs, defense counsel should have anticipated that plaintiff's counsel would not be, thus compromising their own clients' defense. This strategy also displays a certain level of apathy towards the public's great interest in investigating allegations of police brutality. For both of these reasons, it is troubling that defense counsel allowed Dekoker, for example, to deny ever

do not get a do-over because, in hindsight, they should have done more to ascertain what the photographs actually depicted. Therefore, the defendants' motion for a new trial based on unfair surprise is denied.

## E. Compensatory Damages

The defendants next argue that the jury's $125,000 award of compensatory damages for false arrest is excessive and should be reduced because: (1) Thomas was only in police custody for one hour, and (2) damages for the remaining six or so hours that Thomas spent in the hospital "were a consequence of independent decisions made by medical personnel at the hospital and not defendants." (Post-Trial Motion at 23.) Defendants also claim that "the suggestion by plaintiff's counsel of a specific dollar amount in damages that the jury should award was improper, and unduly prejudiced defendants."

### 1. Standard of Review

"Remittitur is appropriate to reduce verdicts only in cases in which a properly instructed jury hearing properly admitted evidence nevertheless makes an excessive award." Tatum v. Jackson, 668 F. Supp. 2d 584, 602 (S.D.N.Y. 2009) (quoting Werbungs Und Commerz Austalt v. Collectors' Guild, Ltd., 930 F.2d 1021, 1027 (2d Cir. 1991)). Courts "are constrained to give due deference to the fact-finding role of the jury when reviewing a claim of excessive damages." Gardner v. Federated Dept. Stores, Inc., 907 F.2d 1348, 1353 (2d Cir. 1990). "A jury verdict is excessive if it is so high that it shocks the conscience of the court." Fink v. City of New York,

---

stepping on Thomas's hair without sufficiently attempting to see what the photographs actually showed (e.g., by magnifying or lightening them).

129 F. Supp. 2d 511, 531 (E.D.N.Y. 2001) (citing Lee v. Edwards, 101 F.3d 805, 808 (2d Cir. 1996)).

In making this determination, "courts have reviewed awards in other cases involving similar injuries, bearing in mind that any given judgment depends on a unique set of facts and circumstances." Scala v. Moore McCormack Lines, 985 F.2d 680, 684 (2d Cir. 1993) (citation omitted). "When considering whether the award falls with a reasonable range, however, the Court does not balance the number of high and low awards and reject the verdict in the instant case if the number of lower awards is greater." Tatum, 668 F. Supp. 2d at 602 (quoting DiSorbo v. Hoy, 343 F.3d 172, 184 (2d Cir. 2003)) (internal quotation marks and alterations omitted). "Where, as here, the argument for remittitur is that the award is 'intrinsically excessive,' but the excess is 'not attributable to a discernable [sic] error,' the Court may 'reduce the award only to the maximum amount that would be upheld as not excessive.'" Id. (quoting Disorbo, 343 F.3d at 183) (quotation marks and alterations omitted).

An individual subjected to a false arrest is entitled to two types of compensatory damages: (1) for loss of liberty and (2) for physical and emotional distress. See Martinez v. The Port Authority of New York and New Jersey, 445 F.3d 158, 161 (2d Cir. 2006); Kerman v. City of New York, 374 F.3d 93, 125 (2d Cir. 2004). The first category compensates an individual's "denial of free movement and the violation done to [an individual's] dignity as a result of the unlawful detention." Gardner, 907 F.2d at 1353; see also Kerman 374 F.3 at 125–26 (holding that, even without other injuries, "an award of several thousand dollars may be appropriate simply for several hours' loss of liberty"). Furthermore, the Supreme Court "repeatedly has recognized that civil commitment for any purpose constitutes a significant deprivation of liberty." Addington v. Texas, 441 U.S. 418, 425 (1979) (citing Jackson v. Indiana, 406 U.S. 715

33

(1972); <u>Humphrey v. Cady</u>, 405 U.S. 504 (1972); <u>In re Gault</u>, 387 U.S. 1 (1967); <u>Specht v.
Patterson</u>, 386 U.S. 605 (1967)).  In addition to curtailing liberty, the Supreme Court has
acknowledged that "involuntary commitment to a mental hospital," in particular, causes "adverse
social consequences to the individual" and has "a very significant impact on the individual." <u>Id.</u>
at 425–26.  The second category compensates the individual for injuries actually suffered, which
includes "physical harm, embarrassment, or emotional suffering." <u>Id.</u> at 125.

The verdict form agreed upon by the parties did not require the jury to award damages for
loss of liberty separate from damages arising from physical and emotional distress.[12]
Nevertheless, the award of $125,000 necessarily reflects both categories of false arrest damages.
A review of the evidence offered at trial demonstrates that the compensatory damage award is
adequately supported in the record.  The jury heard evidence that Thomas spent approximately
forty-five minutes laying chest-down in the snow, handcuffed, while police officers physically
and verbally abused him in front of his girlfriend and neighbors. (Marrow Tr. 20:3; Busgith Tr.
5:3–17; Sookraj Tr. 17:5–6.)  There was evidence—in the form of oral testimony and
photographs—that during this unlawful restraint, one of the police officers held him down by
stepping on his hair and another by stepping on his legs.  Thomas testified that one of the officers
kicked snow in his face and then actually kicked him in the face.  As Thomas was being dragged

---

[12] In their reply brief, the defendants state that "[u]nfortunately, defendants' proposed special interrogatories, which
would have shed light to [sic] these salient issues, were rejected by the Court." (Defendants' Reply at 8.)  As
defendants are well aware, the special interrogatories they proposed—which the Court rejected—were only for the
purpose of qualified immunity.  Defendants had an opportunity to propose a verdict sheet that "would have shed
light [on] these salient issues" but instead proposed that the jury merely "[s]tate a fair and reasonable dollar amount
of any actual compensatory damages that plaintiff has proven he sustained as a result of being falsely arrested."
Only after the jury found Kelly (and Dekoker and McAuliffe) liable, did defense counsel show an interest in having
the jury resolve a litany of factual issues.  The Court agreed to ask the jury four additional questions to the extent it
aided the Court's qualified immunity inquiry, but rejected proposed questions that would have the jury revisit factual
issues it already decided in rendering its verdict.  <u>See</u> <u>Robertson</u>, 2010 WL 1930658, at *4.

away by his hair, he did not know where the officers were taking him and screamed out

Marrow's name "real loud so she could see me or know what is going on." (Thomas Tr. 25:22–

25, Marrow Tr. 20:15–20.) Thomas testified that he felt "like a piece of trash"—"disrespected,

violated, humiliated [and] embarrassed"—"because I never had nothing happen to me like that

before and everybody around the neighborhood knows me as a respectable person." (Thomas Tr.

27:22–23, 35:11–16.) Then, still in view of his girlfriend and neighbors, Thomas was placed in a

restraint jacket, strapped to a stretcher, and put into an ambulance. (Marrow Tr. 26:4.) At the

hospital, he was sedated despite his protests that he did not want to be injected with any needles.

(Thomas Tr. 28:18.) Before he lost consciousness, he was "cold, scared, nervous, shaking . . .

[and] confused," and his hands were "hurting and killing" him. (Thomas Tr. 29:14–16.)

The defendants argue that the six hours Thomas spent at the hospital were a result of

independent decisions made by medical personnel, and not Kelly, and therefore should not be

factored into his compensatory damages award. However, only an "intervening act or omission

that is 'extraordinary under the circumstances' and is 'not foreseeable in the normal course of

events' . . . may break the causal chain of events and remove liability from an earlier acting

defendant." Martin v. City of New York, 793 F. Supp. 2d 583, 586 (E.D.N.Y. 2011) (quoting

Derdiarian v. Felix Contracting Corp., 51 N.Y.2d 308, 315 (1980)). An intervening act "must be

a new and independent force, which was not set in motion by the defendant's own wrongful acts,

and must rise to such a level of culpability as to replace the defendant's [culpability] as the legal

cause." Id. (quoting Zahrey v. City of New York, 98-cv-4546 (DCP) (JCF), 2009 WL 1024261,

at *4 (S.D.N.Y. Apr. 15, 2009)). Here, it can hardly be deemed "extraordinary" or "not

foreseeable" that when a police officer calls an ambulance for a person suspected of having a

mental illness and threatening suicide, that the medical personnel at the hospital will treat him accordingly. This treatment was not a "new and independent force" but rather was "set in motion by the defendant[s'] own wrongful acts." See Martin, 793 F. Supp. 2d at 586. Furthermore, to the extent that Thomas was yelling and "incoherent" by the time he got to the hospital, this too was the foreseeable result of Kelly's wrongful acts. Although an intervening independent judgment of a trial judge and prosecutor has been to be held to be "superseding causes that avoid liability of an initial actor," see Townes v. City of New York, 176 F.3d 138, 142 (2d Cir. 1999), an emergency room doctor does not have the opportunity to make independent factual determinations and conduct his or her own research in the same way as those "participants in the legal system." See Zahrey, 221 F.3d at 351.

The jury's compensatory damages award of $125,000 for false arrest is within the wide range of false arrest awards deemed reasonable by other courts in this Circuit. See, e.g., Martinez, 445 F.3d at 160 (affirming order of remittitur of $360,000 (roughly $410,000 in 2012 dollars)[13] to plaintiff for emotional distress, mental anguish, and loss of liberty of 19 hours of custody arising from false arrest); Gardner, 907 F.2d at 1354 (ordering remittitur award of $50,000 for deprivation of liberty where plaintiff was falsely arrested and in custody for approximately eight hours, and upholding award of $150,000 (roughly $88,000 and $260,000, in 2012 dollars, respectively) for past pain and suffering for sustaining an injury to the jaw and emotional distress); Sulkowska v. City of New York, 129 F.Supp. 2d 274, 308–09 (S.D.N.Y. 2001) (concluding that plaintiff who was humiliated during a false arrest and subsequent

---

[13] I reached this result by using a CPI Inflation Calculator on the website for the Bureau of Labor Statistics. See http://www.bls.gov/data/inflation_calculator.htm. Judge Crotty used this website to adjust damage awards to 2005 dollars in Martinez v. Port Auth. of N.Y. & N.J., 01-cv-721 (PKC), 2005 WL 2143333, at *20 n.9 (S.D.N.Y. Sept. 2, 2005) aff'd, 445 F.3d 158 (2d Cir. 2006).

detention of around a half-day was entitled to $275,000 (roughly $360,000 in 2012 dollars) because she suffered from post-traumatic distress disorder with accompanying symptoms of depression, fear, and disturbed sleep); Martinez v. Gayson, 1998 WL 564385, at *6 (E.D.N.Y. June 30, 1998) (ordering remittitur amount of $160,000 (roughly $227,000 in 2012 dollars) for five hours of imprisonment); Bert v. Port Authority of N.Y. and N.J., 166 A.D.2d 351, 351 (1st Dep't 1991) (awarding $100,000 (roughly $169,000 in 2012 dollars) for three hours of imprisonment and humiliation); cf. Manganiello v. City of New York, 612 F.3d 149, 168 (2d Cir. 2010) (upholding award for malicious prosecution of approximately $116,000 (roughly $123,000 in 2012 dollars) for "wrongful incarceration and humiliation").

    In Gardner, a case decided in 1990, which involved a similar, albeit it less, amount of time spent in custody, "limited physical injuries," and a plaintiff who did not seek psychological treatment, the Second Circuit found that a total of $200,000 was not excessive—which in 2012 dollars would roughly amount to $350,000.  While there are harms suffered by the plaintiff in Gardner that are not present here, there are harms in this case which were not present in Gardner either.  For example, Thomas suffered a more painful and restrictive deprivation of liberty than one typically experiences in police custody, because in this case Thomas was physically held down in the snow for about forty-five minutes, while having his hair and legs stepped on, and then put in a restraint jacket and strapped to a stretcher.  In addition, the harm of subjecting an individual to the stigma of being civilly committed for mental health issues was not present in Gardner either.  Therefore, an award of $125,000 is well below "the maximum amount that would be upheld as not excessive" in similar circumstances, see Tatum, 668 F. Supp. 2d at 602, and the Court does not find that this award "shocks the judicial conscience."

The Court also rejects the defendants' argument that the suggestion by plaintiff's counsel in his closing argument that the jury should award Thomas a specific dollar amount resulted in an excessive award.  As the Court just determined, the jury's award was adequately supported by the record.  While the Second Circuit undoubtedly "disfavors" such suggestions to the jury and "encourage[s] trial judges to bar such recommendations," the Second Circuit "has not adopted a per se rule about the propriety of suggested damage amounts." Consorti v. Armstrong World Indus., 72 F.3d 1003, 1016 (2d Cir. 1995), rev'd on other grounds, 518 U.S. 1031 (1996).  To cure any potential prejudice, the Court reminded the jury that "[w]hat the lawyers have said the evidence shows in their opening statements, objections or questions, or have said in their closing arguments, is not evidence."  (Charge to Jury Tr. at 3.)

## F. Punitive Damages

Finally, defendants argue that the jury's award of $500,000 in punitive damages should be vacated or in the alternative substantially reduced.

Punitive damages are available in a § 1983 action "'when a defendant's conduct is shown to be motivated by an evil motive or intent or when it involved reckless or callous indifference to the federally protected rights of others.'" Lee v. Edwards, 101 F.3d 805, 808 (2d Cir. 1996) (quoting Smith v. Wade, 461 U.S. 30, 56 (1983)).  "Although a jury has wide discretion, a district court may refuse to uphold a punitive damage award when the amount is 'so high as to shock the judicial conscience and constitute a denial of justice.'" Lee, 101 F.3d at 808 (quoting Hughes v. Patrolmen's Benevolent Ass'n of New York, Inc., 850 F.2d 876, 883 (2d Cir. 1988)).  The Second Circuit recently emphasized the role of judges to "safeguard against excessive verdicts," and stated that the "shocks the conscience" standard is established by "a degree of

excessiveness less extreme than 'grossly excessive.'" See Payne v. Jones, 09-cv-5201, 2012 WL 4513114 (2d Cir. Oct. 3, 2012) (citations omitted). In Payne, the court expressed particular concern where, as here, the "taxpaying public . . . bears the brunt of an excessive award," via indemnification of government officials, and questioned "the logic of giving a single plaintiff the money exacted to punish and deter misconduct affecting the community." Id. at *8. These considerations notwithstanding, the Second Circuit also instructs that, "[i]n gauging excessiveness, [courts] must keep in mind the purpose of punitive damages: 'to punish the defendant and to deter him and others from similar conduct in the future.'" Lee, 101 F.3d at 809 (quoting Vasbinder v. Scott, 976 F.2d 118, 121 (2d Cir. 1992)).

In determining whether a punitive damages award is excessive, federal trial courts reviewing a jury's verdict should relate the facts of the underlying case, construed in the light most favorable to the nonmoving party, see Scala, 985 F.2d at 683, to the three "guideposts" used by the Supreme Court in BMW of North America, Inc. v. Gore, 517 U.S. 559 (1996). The three guideposts are the: "(1) degree of reprehensibility of the defendant's conduct, (2) relationship of the punitive damages to the compensatory damages, and (3) criminal and civil penalties imposed by the state's law for the misconduct in question." See Payne, 2012 WL 4513114, at *10 (citing Gore, 517 U.S. at 574–75). Notably, in Payne, a case involving an excessive force verdict against a defendant police officer in which the plaintiff was awarded a "substantial" amount of compensatory damages ($60,000), the Second Circuit found that the second and third guideposts "tell us little that his useful about the size of the award." Id. at *13. Rather, the court found that the first guidepost—the degree of reprehensibility of the defendant's conduct—to be the most helpful and important. Id. Additionally, the court found that comparing

the jury award "to court rulings on the same question in other cases" aided its excessiveness inquiry. Id.

## 1. Degree of reprehensibility

The degree of reprehensibility is "[p]erhaps the most important indicium of the reasonableness of a punitive damages award." Id. (quoting Gore, 517 U.S. at 575). "This guidepost is particularly important and useful because punitive damages are intended to punish, and the severity of the punishment . . . should vary with the degree of reprehensibility of the conduct being punished." Id. (citing State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 419 (2003)). Factors affecting the degree of reprehensibility may include: "(1) whether a defendant's conduct was violent or presented a threat of violence, (2) whether a defendant acted with deceit or malice as opposed to acting with mere negligence, and (3) whether a defendant has engaged in repeated instances of misconduct." Lee, 101 F.3d at 810 (citing Gore, 517 U.S. at []).

Here, the evidence shows that Kelly's conduct was highly reprehensible. First, Kelly egregiously abused the authority granted to him to under New York State's civil commitment law. Section 9.41 of the N.Y. Mental Hygiene Law allows a police officer to involuntarily have an individual taken to a specialized hospital (see id. § 9.39) only when that person "appears to be mentally ill" and is "conducting himself or herself in a manner which is likely to result in serious harm to the person or others." Thomas was neither; yet Kelly arrested him anyway, under the pretense that Thomas made a suicidal statement. In so doing, Kelly violated the public's trust that police officers granted the power to civilly commit those who pose a danger to themselves or others not use the civil commitment laws as a criminal enforcement tactic against those who have not committed a crime. Second, in carrying out the arrest, Kelly felt justified

40

using (and allowing others to use) excessive force against a person who he claimed was mentally ill, and who was not violent or threatening to any of the officers. Busgith testified that Kelly and two other officers threw Thomas onto the ground and proceeded to punch and kick him. Thomas testified that when Kelly initially "rushed" at him while Thomas was bent over picking up his belongings, Kelly kneed him in the face. Finally, the evidence shows that Kelly, as commanding officer at the scene, allowed his subordinates to make racist and misogynistic threats toward Thomas—again, a man who they claim appeared to be mentally ill and needed to be taken to a hospital for psychiatric evaluation. These actions clearly show a "callous indifference," if not an outright hostility, to Thomas's Fourth Amendment right to be free from unreasonable seizures. See Lee, 101 F.3d at 808.

The evidence also demonstrated that Officers Dekoker and McAuliffe maliciously used excessive force (by standing on his hair and legs, respectively) against a defenseless man (who they claimed was mentally ill) while he was handcuffed on the ground, not resisting, and surrounded by several officers. Despite defendants' assertions to the contrary, there was absolutely no evidence for a jury to conclude that these acts were accidental or merely negligent. Though not as reprehensible as Kelly's conduct, their actions strongly support the imposition of some punitive award.[14]

2. Relationship between harm and punitive damages award

The next Gore guidepost asks "whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the

---

[14] In light of evidence that Dekoker struck Thomas's hand, Dekoker's conduct was more reprehensible than McAuliffe's.

harm that actually has occurred." Payne, 2012 WL 4513114, at *11 (quoting Gore, 517 U.S. at 581). "Courts often consider the ratio of the punitive damages award to the compensatory award, and consider whether that ratio is reasonable in the circumstances of the case." Id. The Supreme Court has "repeatedly stressed the impossibility of making any bright-line test as the propriety of the ratio can vary enormously with the particular facts of the case." Id. (citing Gore, 517 U.S. at 582–83.). "[I]n cases of very small injury but very reprehensible conduct, the appropriate ratios can be very high." Id. However, "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit." Id. (quoting State Farm, 538 U.S. at 425).

Here, Thomas was awarded $125,000 in compensatory damages against Kelly for false arrest, and only $1 in nominal damages against Kelly, Dekoker, and McAuliffe for excessive force. The jury awarded a total of $500,000 in punitive damages against all three defendants combined. The ratio of compensatory damages for Thomas's false arrest injuries is 4 to 1, while the ratio for Thomas's excessive force injuries is 500,000 to 1. Although Thomas received a substantial amount of compensatory damages for his false arrest claim, the high degree of reprehensibility of Kelly's conduct suggests that a ratio of 4 to 1 is on the higher end, but not too high. However, Dekoker and McAuliffe's conduct in using excessive force against Thomas was not as reprehensible as Kelly's conduct in falsely arresting Thomas, and so a ratio of 500,000 to 1 does appear high. See Payne, 2012 WL 4513114, at *11 (citing Lee, 101 F.3d at 807–08).

3. Penalties imposed by law for the conduct giving rise to punitive damages

The final "guidepost" instructs the trial court, when possible, to "accord substantial deference to legislative judgments concerning appropriate sanctions for the conduct at issue." Id.

42

at *12 (quoting Gore, 517 U.S. at 583).  Applying this guidepost to this case, it appears that

Kelly's conduct could support his prosecution in New York for a class "B" felony of kidnapping

in the second degree, see N.Y. Penal Law § 135.20, and Kelly's, Dekoker's, and McAuliffe's

conduct could support their prosecution for a class "A" misdemeanor of assault in the third

degree, see id. § 120.00.  An individual is guilty of kidnapping in the second degree when "he

abducts another person."  See id. § 135.20.  Kidnapping in the second degree is punishable by a

prison sentence up to a maximum of twenty-five years, see id. § 70.00, and a fine not to exceed

$5,000, see id. § 80.00.  An individual is guilty of assault in the third degree when, "[w]ith intent

to cause physical injury to another person, he causes such injury to such person or to a third

person."  Id. § 120.00.  Assault in the third degree is punishable by a prison sentence up to a

maximum of one year, see id. § 70.15(1), and by a fine not to exceed $1,000, see id. § 80.05(1).

That New York regards Kelly's conduct with a high degree of criminality, but regards Dekoker's

and McAuliffe's conduct as "occupying a lower echelon of criminality," see Payne, 2012 WL

4513114, at *12, confirms the Court's earlier indication that Kelly's conduct is extremely

reprehensible, while Dekoker's and McAuliffe's conduct, though surely reprehensible, does not

reach this level.  Nevertheless, all the defendants should been aware that their conduct was

criminal.


4. Comparison with punitive damages awards in similar cases

        Comparing the award in this case to the ruling in the recent decision in Payne is

instructive.  In that case, the Second Circuit ordered a reduction of the amount of punitive

damages to $100,000 against a police officer, Jones, who used excessive force against a plaintiff

who he had arrested under N.Y. Mental Hygiene Law § 9.41.  Id. at *1.  In reviewing the

punitive damages award for excessiveness, the court found Jones's conduct reprehensible because he "gratuitously provoked Payne with a verbal taunt" and lost his temper by "punching Payne [who was handcuffed] in the face and neck seven to ten times and kneeing him in the back several times." Id. The court also noted as an "aggravating factor" that Jones "recognized that Payne might be mentally ill." Id. at *10. However, the court considered certain "mitigating factors" in the Jones's favor. Id. First, Payne also provoked Jones by making violent threats and kicking him in the groin. Id. Second, Jones's "attack on Payne . . . lasted at most 30 seconds, did not involve the use of a weapon, and did not cause any serious physical injuries." Id. at 10.

Here, Kelly's conduct is arguably as reprehensible as the conduct at issue in Payne, if not more, but it is not mitigated by the plaintiff's own conduct as it was in Payne. Similar to the defendant's conduct in Payne, Kelly lost his temper and physically abused a man he thought might be mentally ill. Kelly kneed Thomas in the face, threw him to the ground, and proceeded to punch and kick him. However, unlike in Payne, Thomas did not make a violent threat or make physical contact with any officer to provoke Kelly. Additionally, the plaintiff in Payne was actually "combative and disoriented" prior to his arrest, and so the defendant did not falsely arrest him under N.Y. Mental Hygiene Law § 9.41. Id. at 1. In stark contrast, Kelly falsely arrested Thomas under N.Y. Mental Hygiene Law § 9.41 even though Thomas did not actually appear mentally ill. As discussed above, this is what makes Kelly's conduct extremely reprehensible. Therefore, comparing the facts in this case to the ruling in Payne, it follows that $100,000 should be the minimum amount of punitive damages awarded against Kelly.

Other cases have awarded punitive damages against police officers who use excessive force against a defenseless plaintiff. In O'Neill v. Krzeminski, the Second Circuit sustained a punitive damages award against two defendants totaling $185,000 where the plaintiff "while

handcuffed and unable to defend himself, was struck repeatedly about the head." 839 F.2d 9, 13–14 (2d Cir. 1988). In 2012 dollars, this award roughly equals over $350,000 for the two defendants. In Ismail v. Cohen, a police officer struck the plaintiff in the back of the head following an argument over a parking citation written by the officer causing the plaintiff to briefly lose consciousness. 899 F.2d 183, 185 (2d Cir. 1990). The plaintiff awoke to the officer pressing a gun against his head a knee into his back. Id. The Second Circuit reinstated the jury's award of $150,000 in punitive damages. Id. In 2012 dollars, this award roughly equals over $260,000 for the single defendant. In King v. Macri, where state court security officers punched plaintiff repeatedly, even after he was laying on the ground, and used a choke-hold on him in the course of placing him under arrest, the Second Circuit reduced the jury's punitive damages award against the officers to $100,000 and $50,000, respectively. 993 F.2d 294, 296–99 (2d Cir. 1993). In 2012 dollars, this award roughly equals over $160,000 and $80,000, respectively.

5. Totality of all the factors

The Court does not find that the punitive damages award against all three defendants in the amount of $500,000 to be grossly excessive. However, the "shocks the conscience" standard is established by "a degree of excessiveness less extreme than 'grossly excessive.'" See Payne, 2012 WL 4513114, at *9. In consideration of the guideposts and case comparisons above, the Court finds that $500,000 to be somewhat excessive. The most reprehensible conduct was related to Thomas's false arrest claim, for which he already received substantial compensatory damages. The Court also notes that the conduct of Dekoker and McAuliffe was not as reprehensible as that of Kelly (and Dekoker's more so than McAuliffe's). However, as the Second Circuit remarked in Zarcone v. Perry, where "the abuse of official power . . . was intolerable, and when a jury has dealt with it severely, as it should, we will not draw fine lines to

restrain its dispensation of justice." 572 F.2d 52, 57 (2d Cir. 1978). With this in mind, the Court

finds that Kelly's conduct warrants substantial punitive damages, but no more than $200,000;

Dekoker's no more than $100,000; and McAuliffe's no more than $25,000.  Accordingly, a new

trial limited to the issue of punitive damages is ordered, unless Thomas agrees to a remittitur

reducing the amount of punitive damages to a total of $325,000.


## CONCLUSION

For the reasons discussed above, the defendants' motion for judgment as a matter of law

is denied.  The defendants' motion for a new trial with respect to defendants' liability is also

denied.  The defendants' motion for a new trial is denied with respect to the compensatory

damages on plaintiff's false arrest claim.  The defendants' motion for a new trial is granted with

respect to the punitive damage award unless plaintiff accepts a remittitur reducing the amount of

punitive damages to $325,000.

SO ORDERED.

Dated:         New York, New York
               October 23, 2012

                                   ANDREW L. CARTER, JR.

                                   United States District Judge