```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 6-4-13
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

SEAN THOMAS,           :

           Plaintiff,           :           09 Civ. 3162 (ALC)

   -against-           :           **OPINION AND ORDER**

THE CITY OF NEW YORK ET AL.,
                                             :
           Defendants.
------------------------------------------------------------X

**ANDREW L. CARTER, JR., United States District Judge:**

    Defendants Sergeant Stephen Kelly and Officers Michael McAuliffe and Thomas Dekoker (collectively, "Defendants") move to vacate a jury verdict and judgment in favor of Plaintiff Sean Thomas ("Thomas" or "Plaintiff"). Additionally, they seek dismissal with prejudice of Thomas's complaint or, in the alternative, a new trial. For the reasons discussed below, Defendants' motion to vacate is granted and the matter will be set for a new trial.

## BACKGROUND

    Thomas brought this action under 42 U.S.C. § 1983, alleging false arrest and excessive use of force against several police officers for events occurring on the night of December 20, 2008. This case could not be resolved through motion practice so a jury was impaneled, a trial held and a verdict rendered. Defendants, however, question whether this verdict can stand in light of a contract between Thomas and a key plaintiff witness, Letitia Marrow ("Marrow") entered during the pendency of the trial.

    Although the relevant facts of Thomas's claim are set forth elsewhere, (see, e.g., Dkt. No. 72, 131), a brief recitation of facts is necessary for resolution of this motion. On December 20, 2008, Thomas and Marrow, Thomas's then-girlfriend, were arguing in her Bronx apartment.

1

Thomas was also living in the apartment although his name was not on the lease. The argument was loud enough that their downstairs neighbor heard and called 911 to report a "domestic violence dispute" in Marrow's apartment. The night ended with Thomas handcuffed, wrapped in a restraint blanket, strapped to a stretcher, and transported in an ambulance to receive a psychiatric evaluation at St. Barnabas Hospital, where he was involuntarily sedated.

Thomas alleged that these actions amount to use of excessive force against all Defendants and false arrest against Sergeant Kelly for authorizing Thomas's psychiatric detention. Defendants justify their actions as consistent with the procedure for detaining Thomas as an emotionally disturbed person who posed a danger to himself and others pursuant to N.Y. Mental Hygiene Law § 9.41.[1] Thomas contends that the officers overreacted to a routine domestic violence dispute.

The jury trial commenced on June 25, 2012. On July 3, Marrow testified as a witness for Thomas, testifying consistent with his version of events. On July 9, 2012, the jury returned a verdict for the plaintiff, finding Kelly liable for false arrest and awarding plaintiff $125,000 in compensatory damages, and finding Kelly, Dekoker, and McAuliffe liable for using excessive force and awarding plaintiff no compensatory damages and $1 in nominal damages. The jury awarded a total of $500,000 in punitive damages against all three of these defendants. The jury found in favor of all other defendants. On July 11, 2012, the Court entered judgment, affirming the jury verdict for Thomas in the amount of $625,001. By Opinion and Order dated October 23,

---

[1] N.Y. Mental Hygiene Law § 9.41 provides: "Any . . . police officer who is a member . . . of an authorized police department or force . . . may take into custody any person who appears to be mentally ill and is conducting himself or herself in a manner which is likely to result in serious harm to the person or others. Such officer may direct the removal of such person or remove him or her to any [specified] hospital . . . or any [specified] comprehensive psychiatric emergency program."

2012 ("JMOL Order"), this Court denied Defendants' motion for judgment as a matter of law and a new trial but reduced the punitive damages award to $325,000.

With that, the Court was satisfied that its work was done. But the ink on that Order was barely dry when on November 19, 2012, by letter from Plaintiff's counsel, the Court learned that Thomas had entered an agreement with Marrow ("Agreement") while trial was already under way. Dkt. No. 138, Declaration of Raju Sundaran ("Sundaran Decl."), Ex. A (Letter), B (Agreement). The Agreement was dated June 24, 2012 and signed and notarized on June 30, 2012, three days before Marrow testified at trial.

The Agreement unmistakably identified Thomas's civil action against the City of New York and, among other things, promised Marrow 20% of any recovery Thomas received and made her liable for 10% of legal fees if his case was unsuccessful and the Defendants sought costs. In addition, Plaintiff's counsel, David Zelman and Ryan Asher, were indicated as being "cc'd" on the Agreement but they deny any knowledge of the content of the Agreement until the time they revealed it to the Court. See Agreement, Sundaran Decl. Ex. B.

The letter further memorialized that at some point after the verdict was rendered, Thomas borrowed money from a lending company but refused to give any of the proceeds to Marrow. On July 31, 2012, acting on her purported rights under the Agreement, Marrow filed a summons with endorsed complaint against Thomas[2] in the Civil Court of the City of the New York, Bronx County for "breach of contract or warranty for $25,000.00, with interest from 7/16/2012" and for other claims under index number CV-014284-12/BX. ("Bronx Civil Compl."), Sundaran Decl. Ex. C.

---

[2] Marrow also named another defendant, Ngwansi C Nji, unrelated to this case.

3

The Thomas-Marrow Agreement[3]

    As is relevant here, the Agreement provides:

    I Mr. Sean Thomas . . . hereby agree to the following stipulations regarding myself and Ms. Letitia Marrow for her pain and suffering regarding Civil Suit Case #09 C 3162(CM)(HBP), (Claim # BLA 2009 PI001925) between myself against The City of New York.

    As per an incident to which Ms. Marrow witnessed and is experiencing pain and suffering from on December 20, 2008 she has agreed to assist me in this matter in exchange for monetary compensation in the amount of 20% of the Net Worth of the Settlement Agreement to which I may be awarded of which she expects to receive (5) days after I am compensated while remaining on the premises for 60 days thereafter I shall vacate.

    In as much, in the event I am awarded nothing as a result of losing this case Ms. Marrow agrees to allow me to respectfully remain at the present address rent free Not Including Food/Utilities expenses for 60 days after the case has been heard. And Ms. Marrow agrees to assist me with paying off motorcycle obligations for 6 months through making direct payment for me in the amount of $50 a month to my creditor. In addition, if I lose this case, and in the event that the City of New York seeks a Legal Suit against Me, Ms. Marrow agrees to assists me with 10% of the Legal Fees associated with this case NOT in combination with bike payments, however, at the same rate due to income restrictions.

    In the event I null and void this agreement, Ms. Marrow has the right to move forward to seek Legal Eviction against me to have me removed from the premises immediately. In addition she may also move forward to seek Legal Counsel to move towards a Civil Suit against me to secure her any monies owed to her which will include back rent from 2010 to present.

Agreement, Sundaran Decl. Ex. B.

Marrow Testimony

---

[3] Although the Agreement is likely void for public policy, whether this agreement can be enforced is of no matter here. What is critical is whether it affects the legitimacy of the jury verdict.

At trial, Marrow testified as an eyewitness to the events preceding the arrival of the police through the Thomas's physical detainment. On cross-examination, defense counsel asked Marrow as Thomas's then-girlfriend about her bias in the case:

> Q. Plaintiff is your boyfriend, right?
> A. Yes.
> Q. So, in other words, you're here to help your boyfriend, right?
> A. Yes.
> Q. And in fact you have an interest in this lawsuit, correct?
> A. No.
> Q. You have no interest in this lawsuit, that's your testimony to this jury?
> A. Just justification.
> Q. No. The question is yes or no, Ms. Marrow, you have an interest in this lawsuit, yes or no?
> A. Yes.
> Q. Okay. And if plaintiff recovers money from this lawsuit you too will benefit from that, yes or no?
> A. That I can't answer.
> …
> Q. It is your testimony, again to this jury, that if plaintiff recovers money you won't benefit from that?
> A. I can't answer for him.
> Q. No. I'm asking you if you will benefit from plaintiff recovering money from this lawsuit, Ms. Marrow.
> A. If plaintiff decides to benefit me from it. I can't answer what plaintiff is going to do with his money.

July 3, 2012 Marrow Cross-Examination Trial Tr. 30-31 ("Marrow Cross Tr."), Sundaran Decl. Ex. E

While this Court was just learning of the Agreement, on December 12, 2012, the Bronx court dismissed Marrow's breach of contract claim without prejudice as premature since this civil case was still pending. See Bronx Civil Court Trial Transcript ("Bronx Civil Court Tr."), Dkt. No. 151, Reply Declaration of Raju Sundaran ("Sundaran Reply Decl.") Ex. J.

In making his decision, the Honorable Gerald Lebovits engaged Thomas in a series of questions:

5

> The Court: Tell me what the contract is about.
> Thomas: She put what the contract together which I didn't want to sign.
> The Court: You did sign, so what does it mean?
> Thomas: She expect me to give her 20 percent.
> The Court: For what?
> Mr. Thomas: I don't know.
> The Court: You have to know. You signed it. You're not a fool, are you?
> Ms. Marrow: No, I'm not a fool.
> The Court: What does it mean 20 percent? Why?
> Mr. Thomas: Because she said I deserve that—
> The Court: No, no, no, come on. You're a tough guy. You survived a three week Federal trial suing cops and got a judgment for more than $600,000 for police brutality. What are you, like somebody if I blew at you, you fall down?
> Mr. Thomas: This is not how it came down. She forced me. I have it on video. I have it on video, I said I didn't want to sign the contract.
> The Court: But you signed it. What does that mean?
> Mr. Thomas: Doesn't mean anything to me. First of all, you can't be paid as a witness, to be a witness.
> The Court: Stop. That is part of my question. Do you think it's 20 percent so she can be a witness for you?
> Mr. Thomas: No, it's—
> The Court: Look at me.
> Mr. Thomas: She wanted 20 percent. She said if you don't sign this, I'm not going to court. Simple and plain, and I explained this to my lawyer.
> The Court: No, no, no. Did she tell you it was 20 percent so she can testify on your behalf?
> Mr. Thomas: No, to come to court."
> The Court: For what? Hold on. Was that 20 percent to testify, or 20 percent to give you a cup of coffee when you're on trial?
> Mr. Thomas: She told me she wouldn't come to court. She wouldn't come to court if I didn't sign the paper for 20 percent.
> The Court: Come to court for what purpose?
> Thomas: To testify for me.

Bronx Civil Court Tr. at 11-12, Sundaran Reply Decl. Ex. J.

On November 23, 2012 pursuant to Rule 60(b)(3) of the Federal Rules of Civil Procedure, Defendants moved for vacatur of the verdict and judgment and dismissal with prejudice of Plaintiff's claims, or in the alternative, a new trial. However, Defendants had already filed a notice of appeal to the Second Circuit Court of Appeals on November 15, 2012.

6

At a hearing on March 11, 2013, the Court indicated on the record that it would grant the motion for a new trial if remanded by the Court of Appeals for that purpose pursuant to Rule 62.1 of the Federal Rules of Civil Procedure.[4] On April 4, the Court of Appeals granted Defendants' request for limited remand to this Court for determination of the motion for vacatur or in the alternative, for a new trial (Dkt. No. 156). On May 21, 2013, the Court of Appeals further dismissed Defendants' appeal without prejudice to reinstatement in the event that this Court denies the Rule 60(b)(3) motion. (Dkt. No. 157). I now consider that motion.

## DISCUSSION

I. Standard of Law

Defendants move pursuant to subsection (b)(3) permitting relief from a verdict for fraud, misrepresentation or misconduct. Fed. R. Civ. P. 60(b)(3) ("On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for . . . fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party."). A motion for a new trial under Rule 60(b)(3) must be made within one year from the entry of judgment. See Fed. R. Civ. P. 60(c)(1). Defendants moved for a new trial on November 23, 2012. Judgment was entered on July 11, 2012 and subsequently modified by the JMOL Order on October 23, 2012. Thus, Defendants' motion is timely and we may consider its merits.

---

[4] Fed. R. Civ. P. 62.1 provides a mechanism for the Court to provide an indicative ruling where relief is otherwise barred by a pending appeal: "If a timely motion is made for relief that the court lacks authority to grant because of an appeal that has been docketed and is pending, the court may:

(1) defer considering the motion;
(2) deny the motion; or
(3) state either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue."

To prevail on a motion for a new trial pursuant to Fed. R. Civ. P. 60(b)(3), the movant must show that (1) the adverse party engaged in fraud, misrepresentation or misconduct by clear and convincing evidence and that (2) such misconduct substantially interfered with the movant's ability to fully and fairly present its case. See Catskill Development, L.L.C. v. Park Place Entertainment Corp., 286 F. Supp. 2d 309, 312 (S.D.N.Y. 2003) (citations omitted). The final question is whether substantial justice outweighs the goal of preserving the finality of judgments. Id. (citing Nemaizer v. Baker, 793 F.2d 58, 63 (2d Cir. 1986)).

Whether to grant a 60(b) motion for relief from a judgment is "committed to the sound discretion of the district court," Stevens v. Miller, 676 F.3d 62, 67 (2d Cir.2012) (citation and internal quotation marks omitted), and are generally granted only upon a showing of "exceptional circumstances," Motorola Credit Corp. v. Uzan, 561 F.3d 123, 126 (2d Cir. 2009) (citations omitted). "To grant relief from a final order pursuant to Rule 60(b), a court must find that (1) the circumstances of the case present grounds justifying relief and (2) the movant possesses a meritorious claim in the first instance." Cobos v. Adelphi Univ., 179 F.R.D. 381, 385 (E.D.N.Y. 1998).

Although the scope of "misconduct" is not defined, it certainly envisions a wider scope than fraud or misrepresentation lest it be redundant. Anderson v. Cryovac, Inc., 862 F.2d 910, 923 (1st Cir. 1988) ("For the term to have meaning in the Rule 60(b)(3) context, it must differ from both 'fraud' and 'misrepresentation.' Definition of this difference requires us to take an expansive view of 'misconduct.'"). The misconduct need not be nefarious to warrant action under 60(b)(3). Id. If, however, the misconduct was intentional, "the movant is entitled to a presumption that the misconduct substantially interfered with the movant's preparation of its case. . . [which] may only be overcome by clear and convincing evidence to the contrary.

8

Anderson v. Beatrice Foods Co., 127 F.R.D. 1, 2 (D. Mass. 1989). "If, on the other hand, the moving party proves no more than that the misconduct is accidental or inadvertent, the moving party must carry the burden of proving substantial interference by a preponderance of the evidence." Id.

To establish substantial interference with the movant's ability to fully and fairly present its case, the moving party need not show that the outcome would have been different absent the misconduct. Catskill, 286 F. Supp. 2d at 316. Substantial interference is established "if a party shows that the concealment precluded inquiry into a plausible theory of liability, denied it access to evidence that could well have been probative on an important issue, or closed off a potentially fruitful avenue of direct or cross examination." Id. (quoting Anderson, 862 F.2d at 925). Nevertheless, even misconduct or concealment of evidence does not substantially interfere with the moving party's presentation of their case if the evidence "turn[s] out to be cumulative, insignificant, or of marginal relevance." Id. (quoting Anderson, 862 F.2d at 924).

II. Application

  A. Clear and Convincing Evidence of Misconduct

The Federal Rules require that a party who has responded to an interrogatory, request for production, or request for admission to "supplement or correct its disclosure or response in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing. . ." Fed. R. Civ. P. 26(e).

Defendants' Interrogatory 22 asked Thomas to "[i]dentify all documents prepared by plaintiff, or any other person, that relate to the Incident, claims and subject matter of this

9

litigation." (Excerpt from Pltf's Response to Interrogatories ("Interrogatories"), Sundaran Decl. Ex. J, at 13). Document Request 1 further asked Plaintiff to "Produce all the documents identified in the preceding Interrogatories." Id. Aware of his duty under Rule 26(e), Thomas responded: "Plaintiff is currently unaware of any such documents other than those previously disclosed and attached herewith. Plaintiff reserves the right to supplement or change this response *up to and including the time of trial.*" Id. at 14 (emphasis added).

The Agreement entered between Thomas and Marrow falls squarely within these parameters. This Agreement, however he tries to spin it, related to the subject matter of the trial. In fact, it referred to the case by name so there could be no doubt. See Agreement ¶ 1 ("I Mr. Sean Thomas. . . hereby agree to the following stipulations regarding myself and Ms. Letitia Marrow for her pain and suffering regarding Civil Suit Case #09 C 3162(CM)(HBP), (Claim # BLA 2009 PI001925) between myself against The City of New York."). As such, Thomas had an ongoing duty to identify and reveal the existence of the Agreement to defense counsel, even after his initial disclosure to the contrary.

For this reason, Thomas's attempt to construe this as a contract to resolve back rent and motorcycle payments is unsuccessful. Even if this was a contract contemplating repayment of back rent and motorcycle payments, it was separate and apart an agreement that financially bound Marrow to the outcome of the case. Agreement, Sundaran Decl. Ex B ("[I]f I lose this case, and in the event that the City of New York seeks a Legal Suit against Me, Ms. Marrow agrees to assist me with 10% of the Legal fees associated with this case NOT in combination with bike payments. . .") (emphasis added). Marrow's agreement to let Thomas continue to live rent free and to assume responsibility for his motorcycle payments was also directly linked to the outcome of the case. Id. ("[I]n the event I am awarded nothing as a result of losing this case Ms.

Marrow agrees to allow me to respectfully remain at the present address rent free [and] agrees to assist me with paying off motorcycle obligations for 6 months. . .").

Finally, under New York law, an agreement to pay a fact witness in exchange for favorable testimony, where such payment is contingent upon the success of a party to the litigation is not permitted and against public policy. Caldwell v. Cablevision Systems Corp. 20 N.Y.3d 365, 371, 984 N.E.2d 909, 912-913, 960 N.Y.S.2d 711, 714 (N.Y. 2013). Here, Thomas entered an agreement with Marrow wherein she would be paid for her testimony. Marrow's payment under the Agreement was contingent on whether Thomas was successful in his suit against the City. In the case of a favorable outcome, Marrow was to receive 20 percent of Thomas's award.[5] If Thomas lost his case, Marrow also promised to assume responsibility for 10% of his legal costs and forgive back rent and motorcycle payments. Marrow and Thomas agreed to a contingency arrangement in every sense of the word—she would benefit only if Thomas was successful and was financially liable if he lost. Her testimony was high-stakes for both Thomas's case and her own wallet. As Defendants point out, this is a far cry from her timid admission that she might share in the award if Thomas chose to benefit her. This Agreement, and the steps taken to conceal it from Defendants, amounts to misconduct within the purview of Rule 60(b)(3).

B. Substantial Interference with Movant's Case

---

[5] The Court is not swayed by any argument that the Agreement referred only to "settlement" of Thomas's claims. Given that trial was underway when the Agreement was executed along with Thomas's subsequent statements that he signed the contract so that Marrow would come to court to testify reveal that the Agreement was not intended to be effective only in the event of an out-of-court settlement.

11

The next determination is whether the misconduct merits a presumption of substantial interference based on the adverse party's intent. I find that it does. For one, Thomas and Marrow knowingly entered the Agreement and took conscious steps to hide it from Defendants' attention. When asked point-blank about her stake in the case, Marrow did not mention the agreement. Instead, she tortured the truth and reduced her financial interest to one dependent on the whim of Thomas's largesse. (See Marrow Cross Tr. at 30) ("Q. No. I'm asking you if you will benefit from plaintiff recovering money from this lawsuit, Ms. Marrow. A. If plaintiff decides to benefit me from it. I can't answer what plaintiff is going to do with his money."). Her failure to mention the newly-signed agreement reeks of underhanded dealing.

Thomas, for his part, entered an agreement that had the ability to affect Marrow's testimony. He has not disputed signing the agreement, only its significance. See Bronx Civil Court Tr., Sundaran Reply Decl. Ex. J, at 11-12 ("The Court: Did she tell you it was 20 percent so she can testify on your behalf? Thomas: No, to come to court... The Court: Come to court for what purpose? Thomas: To testify for me."). He then watched Marrow testify without the vaguest reference to the Agreement that he now contends was absolutely necessary to Marrow's appearance in court on his behalf. He remained quiet despite his ongoing duty to disclose documents that "relate to the Incident, claims and subject matter of this litigation." Interrogatories, Sundaran Decl. Ex. J. Therefore, Thomas's misconduct relating to the Agreement was intentional.

This is so even without getting into the messy possibility that Thomas's attorneys, had they known about the agreement in advance, had a duty as officers of the court, to divulge it. If Plaintiff's counsel were aware of the Agreement at the time of trial, their knowledge would be imputed to Thomas as misconduct, not to mention the possibility of separate disciplinary action

before the bar. I find that the misconduct was knowing and intentional and therefore the presumption arises that the misconduct substantially interfered with Defendants' ability to fully and fairly prepare their case.

Thomas's innocuous suggestion that he entered the agreement so that Marrow would appear in court is a nonstarter as that has been the purpose of subpoenas since time immemorial. His after-the-fact rationalization is also unsatisfying because these are exactly the kinds of refutations he could have offered at trial if Defendants had been able to exercise their rightful opportunity to challenge him about the Agreement.

The contention that the Agreement is only cumulative of the line of questioning into Marrow's bias in the case as Thomas's then-girlfriend is a hollow one. She testified convincingly, at times crying on the witness stand. If Marrow were impeached with the Agreement, the jury may well have thought differently of her and rejected her passionate testimony as nothing more than crocodile tears.

In particular, Marrow was the key witness on the issue before the jury of whether Defendants had probable cause to arrest Thomas for trespassing (See JMOL Order, at 15-16) and gave her version of events about Thomas's custodial detention. These credibility issues went to the heart of the case. As this Court has recognized, "the jury was asked to resolve a stark factual dispute relying primarily on the credibility of those who testified." JMOL Order, at 4. On thie issue of trespassing, all the jury had to rely on was Marrow's word over the Defendants'. See id. at 16 ("Marrow testified that she never asked Thomas to leave but rather only wanted him to go out 'to get some air' . . . The jury was not required to believe the officers' testimony over Marrow's."). When there was outstanding evidence that Marrow's word was not her bond, but rather that she

was bounded by a secret agreement, a reasonable jury could easily have weighed the conflicting accounts differently and in favor of the Defendants.

Plaintiff's reliance on Metso Minerals v. Powerscreen Int'l Distrib. Ltd., 833 F. Supp. 2d 282 (E.D.N.Y. 2011), rev'd on other grounds, 2013 WL 1969309, --- Fed. Appx. ---- (Fed. Cir. May 14, 2013), to downplay the existence of a contract for witness testimony is also faulty. In Metso, in seeking a new trial for newly discovered evidence in a patent infringement, the defendants alleged that a compensation scheme existed between the plaintiff Metso and its key witness from whom it had purchased the patent in question such that the witness would receive a percentage of any recovery obtained. The Metso court ruled that the information would not have changed the outcome since it was already known that the plaintiff could initiate a claim against the witness in connection with the money it had paid him for the patent. So "[w]hether [the witness] had something to gain as a result of [the plaintiff] recovering in this litigation or had something to lose a result of [the plaintiff] being defeated in this litigation, they are flip sides of the same coin." Metso, 833 F. Supp. 2d at 319. Here, beyond any benevolence from Thomas, the jury did not know that Marrow stood either to gain *or* lose depending on the outcome of the case.

Metso also differs from this case because, there, the court conducted most of its analysis under the newly discovered evidence standard of 60(b)(2), not the standard under 60(b)(3) for fraud or misconduct. The standard under 60(b)(3) is "more lenient than its Rule 60(b)(2) counterpart, and properly so [as] [t]he "newly discovered evidence" provision of Rule 60(b)(2) is aimed at correcting erroneous judgments stemming from the unobtainability of evidence. . . [while] Rule 60(b)(3) focuses not on erroneous judgments as such, but on judgments which were unfairly procured." Anderson, 862 F.2d at 924 n.10; Catskill, 286 F. Supp. 2d at 316 (movant

pursuant to 60(b)(3) only required to show inability to fully and fairly present its case, not that the outcome would have been different absent the misconduct). To the extent that the Metso court considered the 60(b)(3) motion, it held that the movant had not satisfied the appropriate evidentiary standard: establishing with clear and convincing evidence that the opposing party engaged in fraud or misconduct, which Defendants have already established here. Because Thomas focuses so heavily on 60(b)(2), he misses the mark that Defendants need not meet such a high bar.

C. Substantial Injustice Versus Judicial Finality

Lastly, I consider whether the misconduct warrants a new trial. It is beyond cavil that "final judgments should not be lightly reopened." Catskill, 286 F. Supp. 2d at 320 (quoting Nemaizer, 793 F.2d at 61). The fact that this case has proceeded to a jury trial and resulted in a verdict calls for the highest level of judicial restraint and interference with that verdict is an extraordinary measure. See id. at 312; Lee v. Marvel Enterprises, Inc., 765 F. Supp. 2d 440, 448 (S.D.N.Y. 2011). In this case, however, it is a necessary one. Despite the virtue of judicial finality, allowing the verdict to rest under these circumstances would not be virtuous.

Defendants have established that the illicit agreement was entered, and once entered, at the very least, they had a right to know about it in order to fully and fairly prepare their case. Indeed, other cases could write off misconduct of as harmless, see Caldwell, 20 N.Y.3d at 371, 984 N.E.2d 909 (trial court's failure to give appropriate jury charge for payment to physician fact witness was harmless as "the substance of the doctor's testimony was such that the jury's assessment was only tangentially related to the doctor's credibility"), or as not amounting to substantial interference, see Anderson v. Beatrice Foods Co., 129 F.R.D. 394, 402 (D. Mass.

15

1989) (noting that "a new trial on the issue . . . would be pointless, wasteful and unwarranted"), in eschewing the need for a new trial.

Here, however, I reiterate that credibility was the very heart of this case. There were no hard facts here: it was precisely Marrow's credibility as a witness and Thomas's credibility as a witness and litigant that the jury was called to weigh. Yet, with straight faces and concealed contract, Marrow and Thomas testified and the jury credited their testimony rather than the equally plausible tale recounted by the Defendants. I cannot speculate as to the outcome had the Agreement been revealed sooner, nor need I do so as 60(b)(3) is aimed not at "correcting erroneous judgments stemming from the unobtainability of evidence" but righting "judgments which were unfairly procured." Anderson, 862 F.2d at 924 n.10. It is not the Court's role to make credibility determinations or weigh the evidence at this stage. Here, as ever, credibility determinations and the weighing of evidence lie within the province of the jury. See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150, 120 S.Ct. 2097, 2110 (2000) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-251, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Curry v. City of Syracuse, 316 F.3d 324, 333 (2d Cir. 2003).

To the extent Defendants seek dismissal of Plaintiff's complaint with prejudice, their motion is DENIED. Defendants provide no support for such a severe sanction as dismissal of the entire claim for an isolated, though egregious, incident of trial misconduct. Furthermore, for the same reason a lesser sanction would be unworkable, outright dismissal would also be improper: at base, this is a credibility issue, which is best resolved by a jury. If the jury chooses to credit Thomas's version of events despite the contract, Defendants will have still had the

opportunity to fully and fairly present their case. That is all that 60(b)(3) aims to do. That aim is best satisfied with a new trial, not a dismissal on the merits.[6]

The Court returns these questions to their rightful audience. The jury verdict is hereby vacated and the parties should approach the Court about the scheduling of a new trial by jury.

## CONCLUSION

Defendants' motion to vacate the jury verdict is GRANTED. The motion to dismiss the complaint with prejudice is denied and the motion for a new trial is granted.

Dated: New York, New York
       June 4, 2013

*[signature]*

Andrew L. Carter, Jr.
United States District Judge

---

[6] Although Defendants also note that the possibility of Plaintiff's counsel's knowledge of the Agreement before Marrow's testimony amounts to fraud on the court, I need not consider that argument having found that relief form judgment is proper under 60(b)(3). Lee v. Marvel Enterprises, Inc., 765 F. Supp. 2d 440, 450 (S.D.N.Y. 2011) ("The standard to prove 'fraud on the court' is extremely high, and relief under Rule 60(d) is 'narrower in scope than that which is sufficient for relief by timely motion under [Rule] 60(b)(3).'") (citations omitted).